**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**Basir LARK, Appellee.**

Superior Court of Pennsylvania.

Submitted July 22, 2013.

Filed April 9, 2014.

Reargument Denied June 10, 2014.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Coley O. Reynolds, Philadelphia, for appellee.

BEFORE: GANTMAN, DONOHUE and PLATT *, JJ.

OPINION BY PLATT, J.:

The Commonwealth appeals from the order of November 13, 2012, which granted the motion of Appellee, Basir Lark, to suppress a child witness's identification of him as her father's murderer.[1] Nothing in the record suggests police misconduct. Furthermore, the suppression court's finding that the identification was not reliable is not supported by the evidence of record. Accordingly, we are constrained to vacate the order of suppression and remand for proceedings consistent with this opinion.

* Retired Senior Judge assigned to the Superior Court.

1. The Commonwealth may take an appeal of right from an order that does not end the entire case if it certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution. See Pa.R.A.P. 311(d); see also Commonwealth v. Torres, 564 Pa. 86, 764 A.2d 532, 536 n. 2 (2001). The Commonwealth has included such a certification in this case. (See Notice of Appeal, 12/10/12).

The underlying facts in this matter are taken from the suppression hearing notes of testimony, unless otherwise noted. On March 25, 2010, Aubrey Brown, the victim, visited the home of Frances McNeill (Mother), to see their then nine-year-old daughter, S.B. and pick up her report card. (*See* N.T. Motion, 11/09/12, at 52, 65–66; *see also* N.T. Preliminary Hearing, 6/23/10, at 5–7). While Mother and the victim were speaking on the front porch, at approximately 2:54 pm, Appellee walked up to the house, stepped onto the grass in front of the porch, and fired three shots, fatally wounding Mr. Brown.[2] When S.B. heard the first shot she ran to the doorway and came outside of the house. (*See* N.T. Motion, 11/09/12, at 66–68; *see also* N.T. Preliminary Hearing, 6/23/10, at 17, 19–20). Mother tried to force her back into the house by pushing the screen door closed. (*See* N.T. Motion, 11/09/12, at 67, 68). The shooter fled, and Mother's sister called the police.

That same day, police transported Mother and S.B. to police headquarters. Before the interview, S.B. sat with her Mother in the police waiting room. However, the police interviewed S.B. and her Mother separately. (*See id.* at 80; *id.*, 11/13/12, at 24). S.B. gave a statement which included a verbal physical description of the man who shot her father to Detective Crystal Williams. (*See* N.T. Motion, 11/13/12, at 23–24). Detective Williams did not give S.B. any information about what her mother was saying, and in fact, did not know what the mother was saying. (*See id.* at 24). Detective Williams testified that after S.B.'s interview, she prepared a written statement which S.B. went over with her mother. No corrections were made. (*See id.* at 25).

The next day, after receiving a tip from a confidential informant who had been a reliable neighborhood source, the police prepared several photo arrays which included Appellee's picture. Each array contained eight photos of African–Americans with similar hair styles, facial hair, complexion and facial shapes. The police took them to Mother's home. Mother was present while S.B. selected Appellee's photo from the array. The police showed Mother a completely different photo array. Mother also picked Appellee's picture. (*See* N.T. Motion, 11/09/12, at 45).

On July 21, 2010, the Commonwealth charged Appellee with murder of the first degree,[3] carrying a firearm without a license,[4] carrying firearms on public streets or public property in Philadelphia,[5] and possession of an instrument of crime.[6]

On October 5, 2012, Appellee filed a supplemental omnibus pretrial motion, which included a motion to suppress.[7] The trial court held a hearing on November 9 and 13, 2012. Following the hearing, the court suppressed S.B.'s identifications (physical description on the day of the murder and next day selection from photo array) of Appellee from the bench.[8] The Commonwealth filed the instant, timely appeal.[9]

---

**2.** Mr. Brown was immediately transported to Hahnemann University Hospital, where he was pronounced dead at 3:07 pm.

**3.** 18 Pa.C.S.A. §§ 2502(a).

**4.** 18 Pa.C.S.A. § 6106(a)(1).

**5.** 18 Pa.C.S.A. § 6108.

**6.** 18 Pa.C.S.A. § 907(a).

**7.** Although designated as supplemental, there is no record of a prior filing of an omnibus motion.

**8.** The suppression court denied the motion to suppress Mother's identification of Appellee.

**9.** On the same day the Commonwealth filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b); the trial court

■ On appeal, the Commonwealth raises the following questions for our review:

I. Did the [trial] court err when it suppressed a nine-year-old witness's out-of-court photographic identification of [Appellee] where the court identified no police misconduct or suggestiveness in the photo array, but speculated that the procedure was tainted by the presence of the child's mother?

II. Did the [trial] court err when it suppressed the child-witness's potential in-court identification at trial where there was no suggestive pre-trial identification procedure, and, in any event, the witness had an independent basis for identifying [Appellee]?

(Commonwealth's Brief, at 3).

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*In re O.J.*, 958 A.2d 561, 564 (Pa.Super.2008) (*en banc*), *appeal denied,* 605 Pa. 688, 989 A.2d 918 (2010) (quoting *Commonwealth v. Mistler*, 590 Pa. 390, 912 A.2d 1265, 1268–69 (2006)) (internal citations and quotations omitted).

■ Furthermore, in *Commonwealth v. Kubis,* 978 A.2d 391 (Pa.Super.2009), this Court explained:

When determining the admissibility of identification testimony, this Court has held that suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. **A pretrial identification will not be suppressed as violative of due process rights unless the facts demonstrate that the identification procedure was so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification.**

*Id.* at 396 (internal quotation marks and citation omitted) (emphasis added). "Due process does not require that every pretrial identification of witnesses must be conducted under laboratory conditions of an approved lineup." *Commonwealth v. Jones,* 220 Pa.Super. 214, 283 A.2d 707, 708–09 (1971) (citation omitted). "In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Commonwealth v. Armstrong,* 74 A.3d 228, 238 (Pa.Super.2013) (citation omitted).

■ Additionally, "the purpose of a suppression order regarding exclusion of identification evidence is to prevent improper police action. Thus, where a defendant does not show that improper police conduct resulted in a suggestive identification,

issued a Rule 1925(a) opinion on January 17, 2013. *See* Pa.R.A.P. 1925.

suppression is not warranted." *Commonwealth v. Sanders*, 42 A.3d 325, 330–31 (Pa.Super.2012), *appeal denied*, 78 A.3d 1091 (Pa.2013) (footnotes omitted) (emphasis added).

 In its first question, the Commonwealth challenges the suppression court's conclusion that S.B.'s identification of Appellee as her father's murderer was tainted. (*See* Commonwealth's Brief, at 3). The Commonwealth argues that the mere fact that S.B. was at times allowed to be with her Mother was inadequate to justify suppression. (*See id.* at 8). We agree.

At the conclusion of the suppression hearings, the suppression court questioned whether the contact between Mother and S.B. prior to the interview S.B. gave to the police at the station and Mother's presence at home during the photo array may have "taint[ed]" the identification process. (N.T. Motion Hearing, 11/13/12, at 66). In its Rule 1925(a) opinion, the court further questioned whether S.B. had the opportunity to witness the incident. (*See* Trial Court Opinion, 1/17/13, at 3–4). We are constrained to conclude that the record does not support either the trial court's factual findings or the legal conclusions drawn from them.

Initially, we note that only the Commonwealth presented testimony at the hearings. There is no evidence from Appellee's witnesses to be considered. Therefore, the only evidence to be considered is that of the Commonwealth's witnesses. The record contains the testimony by S.B. regarding Mother's possible influence at the photo array, or lack thereof, and by both S.B. and Detective Crystal Williams with respect to S.B.'s statement, which contained a description of Appellee. (*See* N.T. Hearing, 11/13/12, at 12–21, 24–28).

Notably, in its opinion, the trial court does not cite to the record or, aside from two brief references for general legal principles, to any legal authority to support its decision. (*See* Trial Ct. Op. at 2–4). Nor does it engage in any substantive discussion of factual support in the record for Mother's possible role in assisting S.B. in her identification of Appellee from the photo array as the perpetrator. (*See id.* at 3–4).

Instead, the court simply states that the identification made at the photo array was unreliable because "S.B. and her mother . . . were able to confer on the identification." (*Id.* at 4) (emphasis added). The mere possibility that something could happen does not support the legal conclusion that something happened.

It bears emphasis that nothing in the record supports the inference that Mother and S.B. conferred either before or during the review of the photo array in any way which tainted S.B.'s identification. During cross-examination of S.B., Appellee's counsel asked her if she and her Mother talked "about the pictures," and S.B. agreed that they had. (N.T. Hearing, 11/13/12, at 12). However, in the ensuing colloquy, S.B. repeatedly answered "No," unequivocally denying that her mother had either told her who to pick out, or suggested what the shooter looked like, or that she and her mother discussed what the person looked like at any point prior to looking at the photographs. (*Id.* at 12–13).

Specifically, when defense counsel asked S.B. if Mother told her whom to pick out, she said, "No." (*Id.*). S.B. also testified that Mother did not tell her what the suspect looked like and she did not discuss the description with Mother when looking at the photos. (*See id.* at 13).

> [Defense Counsel] Q. When you were being shown those pictures your mom was present; correct?
>
> [S.B.] A. Yes.

Q. In fact, it's true that while you were being shown those pictures, you were talking with your mom about the pictures; correct?

A. Yes.

Q. While your mom was telling you who to pick out of the pictures; correct?

A. No.

Q. She wasn't?

A. No.

Q. Did she suggest to you what the person looked like?

A. No.

Q. Did you have a conversation with your mom about what the person looked like at any point prior to looking at the photographs?

A. No.

 \* \* \*

Q. Did any of the [police] officers ask you what you saw?

A. Yes.

Q. They did? What did you tell them?

A. A man got out of a car and shot my dad.

Q. But you learned that from your mother?

A. No.

(N.T. Motion, 11/13/12, at 12–13; 14).

Accordingly, the suppression court's inference that S.B. conferred with her Mother on the identification is not only unsupported by the evidence of record, it is contradicted by it.

Appellee argues that this Court's decision in *Commonwealth v. Jarecki,* 415 Pa.Super. 286, 609 A.2d 194 (1992) supports the trial court's decision to suppress the identification. (*See* Appellee's Brief, at

10–11). However, this reliance is misplaced.

*Jarecki* involved a case of actual collective identification, where some six weeks after the supermarket robbery at issue, the police simultaneously showed the same photo array to at least four multiple witnesses. The record revealed the other witnesses identified the appellant as the robber after the "lead" witness who had the best view of his face (on which the police sketch—which all had seen—was based) had identified him first. *See Jarecki, supra* at 196–98. They also did so after mutual discussion. (*See id.*). Further, the identifications in *Jarecki* were arguably more unreliable than in the instant matter because only one of the witnesses, who pursued the robber, had a view of the defendant's entire face (without a scarf used as a mask). *See id.* In addition, the police had previously shown the witnesses a composite sketch based on the description supplied by that witness, and that witness was the first to make an identification of the defendant, in full view of the other witnesses, from the photo array. *See id.*

Here, in contrast, the record reflects that on the day of the murder, S.B. gave a physical description of the murderer, outside of the presence of her Mother. The next day, S.B. made an identification from a photo array. Mother made a separate identification of Appellee from a completely different photo array than that shown to S.B. (*See* N.T. Motion Hearing, 11/09/12, at 40, 45, 54–55). Thus, there was no collective identification when the police showed the photo array to S.B. Further, there is no evidence that any specific remark made by Mother was unduly suggestive.[10]

---

10. We also note that the nature of the facts surrounding this crime, a child who had just witnessed her own father's murder, certainly presents a sensible, if not compelling, reason for the police to permit the presence of the surviving parent in the waiting room, prior to

Accordingly, we disagree with the trial court's conclusion that S.B.'s being "allowed to sit with her mother outside of the interview room prior to S.B.'s interview[,]" rendered her identification of Appellee unreliable. (Trial Ct. Op., at 4).

As already noted, the record reveals that S.B. gave an essentially similar description of the perpetrator, outside of her Mother's presence, on the day of the murder, to Detective Crystal Williams. (*See* N.T. Motion Hearing, 11/13/12, at 23). Detective Williams testified that Mother and S.B. were waiting together before the interview at the police station but that S.B. gave the statement outside of Mother's presence. (*See id.* at 24, 26). After S.B. completed giving the statement, Mother and S.B. reviewed and signed it, but there was no discussion about the statement nor did S.B. or her Mother make any changes to the statement. (*See id.* at 24–25, 27).

S.B. testified that she and Mother reviewed the statement together but she did not ask her Mother any questions about the statement and Mother did not help her give the statement. (*See id.* at 17). Homicide Detective Nathan Williams, who was involved with the initial investigation into the murder, testified that he warned Mother not to share information with S.B. (*See* N.T. Motion Hearing, 11/09/12, at 79–80).

■ Finally, the suppression court's finding that S.B. was unable to make a reliable identification of Appellee, for lack of opportunity, because "there was competent testimony that the minor was not out on the porch when the shooting occurred" is not supported by the record. (Trial Ct. Op., at 3–4).

The evidence of record confirmed that when the shooting started S.B. ran to the front screen door to see what was happening, and observed Appellee fatally shooting her father. (*See* N.T. Motion Hearing, 11/09/12, at 66–68; N.T. Motion Hearing, 11/13/12, at 13; *see also* N.T. Preliminary Hearing, 6/23/10, at 19–20). Mother also testified that when the shooting started, S.B. ran outside. (*See* N.T. Motion Hearing, 11/13/12, at 66) ("[S]he came outside. . . . She ran outside."). S.B. testified that she saw the shooter, who had gotten out of a car, shoot her father as he stood on the porch, that she saw the shooter run away, and described what the shooter was wearing. (*See* N.T. Motion Hearing, 11/09/12, at 109–12). Thus, the evidence of record simply does not support the trial court's finding that S.B. did not witness the murder.

Under the totality of circumstances test, we conclude that the trial court's suppression of S.B.'s identification as unreliable or "tainted" is unsupported by the record and constituted an error of law. The Commonwealth's first issue merits relief.

■ In its second question, the Commonwealth challenges the court's grant of suppression on the ground that there was no suggestive pre-trial identification procedure. We agree.

The suppression court cites, but does not address, the Commonwealth's denial of suggestiveness, relying exclusively on its determination that S.B.'s identification was tainted and unreliable. (*See* Trial Ct. Op. at 3–4). On independent review, we find no basis to support suggestiveness either.

■ Absent evidence of improper police conduct, resulting in a suggestive iden-

their private interview. In the absence of any specific evidence that Mother actually influenced the child's decision, her mere presence in the waiting room, or the next day, at home, does not render either identification unduly suggestive, and the suppression court offers no authority to the contrary.

tification, suppression is not warranted. *See Sanders, supra* at 330–31. Suppression was erroneous for this reason as well. The Commonwealth's second issue also merits relief.[11]

The suppression court abused its discretion by its reliance on unsupported inferences, and erred in assuming that a mother's mere presence during part of the process of a child's identification of her father's killer renders that identification tainted or unreliable. There is no evidence suggesting that the police procedures for identification were suggestive. Accordingly, we vacate the order of suppression, and remand to the trial court for further proceedings consistent with this opinion.

Order vacated. Case remanded. Jurisdiction relinquished.

DONOHUE, J., files a Dissenting Opinion.

## DISSENTING OPINION BY DONOHUE, J.:

I respectfully disagree with the learned Majority's conclusion that the record does not support the trial court's factual findings. *See* Maj. Op. at 170. Our scope and standard of review clearly state that we are bound to accept the trial court's factual findings that are supported by the record. *Commonwealth v. Fulmore,* 25 A.3d 340, 346 (Pa.Super.2011), *appeal denied,* 613 Pa. 662, 34 A.3d 827 (2011). As such, the Majority runs afoul of our well settled scope and standard of review by making its own contrary factual findings and credibility determinations based upon a *de novo*

review of the cold record. For this reason, I dissent.

In ruling on Lark's suppression motion, the trial court found that (1) S.B. was inside the house when the victim was shot; (2) S.B. was permitted to speak with her mother, Frances McNeill ("McNeill"), prior to giving a statement to the police on the day of the murder; and (3) McNeill was present during S.B.'s interview the following day, during which she identified Lark as the shooter in a photo array. Trial Court Opinion, 1/17/13, at 2. These finding are supported by the following evidence of record: McNeill testified that S.B. was not on the porch before the shooting and that it was only after the shooting that S.B. attempted to come outside, N.T., 11/9/12, at 68; S.B. testified that her mother was with her at the police station on the day of the murder and that they reviewed the statement S.B. gave to the police together, N.T., 11/13/12, at 16–17; and S.B. testified that her mother was present while the detective was showing S.B. the photo array, and that she spoke with her mother about the pictures. *Id.* at 12. Because this testimony supports the trial court's findings, we are bound by them. *Commonwealth v. Henry,* 943 A.2d 967, 969 (Pa.Super.2008), *appeal denied,* 598 Pa. 787, 959 A.2d 928 (2008) ("Our scope of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them.").

The Majority does not abide by this standard, choosing instead to weigh the evidence and make its own findings of

---

11. The Commonwealth also argues that even if the photographic identification procedure had been unduly suggestive, it still would be error to preclude S.B. from identifying Appellant at trial. (*See* Commonwealth's Brief, at 20–24). Because we conclude that suppression was unwarranted for the reasons noted, and specifically find that no suggestiveness is supported by the record, we need not address the issue of whether suppression would still have been unwarranted even if some degree of suggestiveness had been proven, and we decline to do so.

facts. For instance, the Majority concludes that "when S.B. heard the first shot she ran to the doorway and came outside of the house." Maj. Op. at 167. This statement directly contradicts the trial court's finding, supported by competent evidence as cited above, that S.B. was in the house during the shooting. Moreover, this finding was essential to the trial court's ruling, as its decision to grant Lark's suppression motion was based in part on its finding that S.B. did not observe the shooter. Trial Court Opinion, 1/17/13, at 2. By impermissibly reweighing the evidence and making a different factual finding, the Majority undermines the basis for the trial court's ruling.

To bolster its conclusion that the trial court's findings are not supported by the record, the Majority points to testimony that contradicts the trial court's factual findings. For example, the Majority excerpts a portion of S.B.'s testimony during cross-examination by Lark's counsel regarding whether she and McNeill conferred about the photo array in support of its determination. Maj. Op. at 169–70. I do not dispute that there is evidence that would have supported a contrary decision by the trial court; however, the trial court rejected this evidence, as is its prerogative. *See Commonwealth v. Forbes*, 867 A.2d 1268, 1272–73 (Pa.Super.2005) ("The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses."). That is to say, although in one instance S.B. testified that she did not speak to McNeill about the images in the photo array, the trial court rejected that testimony as incredible. By pointing to such evidence in support of its conclusion, the Majority is reweighing the evidence and making its own factual findings.

In sum, because the record supports the trial court's key findings regarding S.B. conferring with McNeill about the identification and S.B.'s location inside the house at the time of the shooting, we must uphold them. *Fulmore*, 25 A.3d at 346. I accordingly dissent.