J. S61002/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ANTONIO STAMPS, | : | No. 421 WDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, September 26, 2012,
in the Court of Common Pleas of Allegheny County
Criminal Division at No. CP-02-CR-0012088-2011

BEFORE:  FORD ELLIOTT, P.J.E., WECHT AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JANUARY 8, 2015**

Following a jury trial, Antonio Stamps ("appellant") was found guilty of first degree murder, and firearms not to be carried without a license. Herein, he appeals from the judgment of sentence entered September 26, 2012, in the Court of Common Pleas of Allegheny County.  We affirm.

On May 11, 2011, Tanika Tyson was at the window of her home on Crucible Street in the Crafton Heights area of Pittsburgh waiting for a ride. She observed a dark-colored SUV pull into a parking lot; the vehicle then turned around and drove down the street.  Tyson did not see the car stop but heard a pop that sounded like a gunshot.  (Notes of testimony, 7/16-19/12 at 202-203, 391-393.)

Pittsburgh 911 dispatcher Amy Chushanick received multiple calls reporting shots fired in the 1500 block of Crucible Street.  One caller who

_____

* Retired Senior Judge assigned to the Superior Court.

identified himself as John stated a 20-year-old man had been shot in the chin by another man at 1558 Crucible Street. The caller stated he had no idea who shot the victim and reported the victim was unresponsive and his breathing was becoming labored. A second anonymous call reported a shooting at 1556 Crucible Street. This caller heard arguing possibly among three men but did not see what transpired; a single gunshot was heard.[1]

Chushanick later placed a return call to a caller and spoke to Eboni Cutler. Cutler was crying and stated a black man wearing a blue and white striped hoody, blue jeans, and black Timberlands had exited the passenger side of his SUV and shot the victim. (*Id.* at 340-341.) Cutler identified the shooter as "Mook," which Chushanick relayed to responding police officers. (*Id.* at 341-342.) On the broadcast, one of the officers noted that appellant went by the nickname "Mook." (*Id.* at 345-346.)

Officer Vincent Pacheco arrived first to the scene and observed the victim lying in a patio area with four females around him, one holding a towel underneath his chin. (*Id.* at 87-89.) The patrolman tried to get as much information from the victim as he could. (*Id.* at 89.) When he asked the victim who the shooter was, the victim was only able to make a "gurgling sound." (*Id.* at 90.) The victim was pronounced dead on June 8, 2011, 27 days after he was shot. An autopsy revealed that a gunshot wound had fractured his chin, traveled to the back of his head, and fractured

---

[1] The 911 tapes were played for the jury.

his spinal cord; this resulted in immediate quadriplegia and paralysis. A medium caliber bullet with a full metal jacket was recovered from the victim's spinal cavity.[2] Dr. Todd Luckasevic stated the victim died of a penetrating gunshot wound to the neck and that the manner of death was homicide.

At the scene, officers made contact with Cutler, who, at the time, wished to remain anonymous out of her fear for her safety and the safety of her child. (*Id.* at 256.) Cutler told the officers that she knew the identity of the shooter as "Mook" who is Antonio Stamps. Officer Pacheco testified that she reported appellant was wearing a blue and white striped hoody, but the description included in his report indicated the shooter was wearing a "hoody sweatshirt black." (*Id.* at 125-126.) Officer Pacheco claimed this was a typographical error. (*Id.* at 126-127.) Cutler was present when the officers asked the victim if he knew who shot him; Cutler testified that she believed the victim did not identify the shooter because of the "code of the streets." (*Id.* at 255-256.)

At trial, Cutler explained that she previously had a relationship with appellant and knew his street name to be "Mook." (*Id.* at 209.) Cutler testified that at approximately 6:00 or 7:00 p.m., she was with appellant and the victim at a cookout near the location of the shooting. (*Id.* at 210-

---

[2] The single .45 automatic casing found at the scene was processed; no fingerprints were discovered. This shell casing was consistent with having discharged the bullet that killed the victim.

211.) Appellant and the victim had an argument over a bond the victim paid for appellant. (*Id.* at 212.) At this point, Cutler testified that appellant had on "all black and a blue and white striped hoody." (*Id.* at 214.) The argument ended and appellant got in his SUV and drove away. (*Id.* at 215.) Cutler called appellant and told him not to return as she was worried "something bad was about to happen." (*Id.* at 217.) She testified that he did not sound angry, but she heard a clicking that sounded like "gun metal" being racked over the phone. (*Id.* at 218-219.)

Later that night, Cutler was outside her home, which she explained is up on a hill, and she saw appellant's SUV drive down Crucible Street, turn around in a rental office parking lot, and park. The area was illuminated by automatic street lights, and Cutler had an unobstructed view as appellant approached the victim. (*Id.* at 220-222, 225.) Cutler observed the tip of a silver gun in his hand. (*Id.* at 226.) Cutler claimed this person was appellant based on his clothing, "all black and blue and white striped hoody" with the hood up obstructing his face. (*Id.* at 223-224.) However, Cutler recognized appellant's mouth and build. (*Id.* at 224.)

Cutler testified that Rodger Henderson was also present and "playing peacekeeper." (*Id.* at 227.) Henderson told appellant to put the gun away and "just fight it out." (*Id.*) Cutler stated the victim looked scared and "just stood there"; he did not have a weapon. (*Id.* at 227-228.) Appellant was pacing back and forth and wiping his mouth. (*Id.* at 228.) Cutler heard

appellant say, "he was [the victim's] bro, and he loved [the victim]." (*Id.*) Appellant then lifted the gun over Henderson's shoulder and shot the victim, who immediately dropped to the ground. Appellant walked up the hill toward where Cutler was standing, got into his SUV, and left the scene. (*Id.* at 229-230.)

Cutler testified that around the time of the victim's death, in early June 2011, she heard from appellant who was at a relative's house in Detroit. (*Id.* at 257-258.) When Cutler asked him why he shot the victim, appellant "acted like he didn't know what I was talking about and changed the subject." (*Id.* at 257.)[3] On June 29, 2011, almost seven weeks after the shooting, Cutler was shown a collection of photographs and identified appellant as the shooter. (*Id.* at 258-260.) Cutler also gave a taped statement to the detectives. Appellant was apprehended in Detroit on August 3, 2011.

Detective Christine Williams recalled that officers went to seven apartments looking for witnesses. Two individuals recalled hearing a gunshot but did not go to the window to see what happened. (*Id.* at 56, 79.) The residents of the other apartments were not home or did not answer their doors. Over defense objection, the detective testified that people rarely cooperate as they are afraid to get involved. (*Id.* at 57-58.)

---

[3] At the conclusion of Cutler's testimony, the court went on a site visit to Cutler's home and the scene of the shooting shortly after 2:00 p.m. (*Id.* at 296-299.)

When asked about the level of cooperation she had seen in her 19 years as a detective, she stated, "it is not very common at all. When we talk to people, they say, 'Don't you understand? I have to live here. I don't want to testify. I can't say nothing. I'm afraid. I got to stay here. You don't have to live here.' That's basically what we hear." (*Id.* at 58-59.)

Pittsburgh Homicide Detective James McGee testified that appellant was not licensed to carry a firearm. McGee further explained that law enforcement made efforts to locate witnesses to the shooting, including Rodger Henderson who was located in the Allegheny County Jail; Henderson refused to speak to the police.

Henderson testified for the defense and stated that he had witnessed the shooting. Henderson claimed to have been outside with friends when he turned and saw a man wearing solid dark clothing and a ski mask, holding a gun in his left hand. Henderson briefly struggled with the gunman who broke free and Henderson fled. (*Id.* at 412-413.) Henderson stated that appellant was not present when the shooting occurred. Henderson stated he believed the shooter was approximately 5'11" tall and that appellant was about 6'2" tall. On cross-examination, Henderson admitted he was friends with appellant, and despite their friendship, he failed to provide any information to police when they approached him in jail. He also admitted to having previously pled guilty to the crimes of providing false identification to a police officer and intimidation of a witness. (*Id.* at 417-418.)

Appellant was charged with one count of criminal homicide and one count of firearms not to be carried without a license. On July 15, 2012, a jury trial was conducted, and thereafter, appellant was found guilty of first degree murder and the firearms offense. On September 26, 2012, appellant was sentenced to life imprisonment with no further penalty imposed. On October 3, 2012, a timely post-sentence motion was filed challenging the weight of the evidence and seeking a new trial. The motion was subsequently denied by operation of law on February 5, 2013. This timely appeal followed, and appellant complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A. The trial court has filed an opinion.

The following issues have been presented for our review:

> I. DID THE COURT ERR IN PERMITTING THE JURY TO ATTEND AN UNNECESSARY AND MISLEADING SITE VISIT THEREBY ALLOWING THE JURY TO OBSERVE THE SCENE WHICH WAS MATERIALLY DIFFERENT THAN THE ACTUAL CRIME SCENE?
>
> II. DID THE COURT ERR IN ALLOWING TESTIMONY FROM OFFICERS THAT WITNESSES TYPICALLY DO NOT COME FORWARD THEREBY IMPROPERLY BOLSTERING THE TESTIMONY OF AN EYE WITNESS BY PORTRAYING HER AS THE NEIGHBORHOOD HERO?
>
> III. WAS IT PREJUDICIAL TO ALLOW THE JURY TO HEAR THAT A DEFENSE WITNESS WAS INCARCERATED WHERE THAT INCARCERATION HAD NO BEARING ON THE CASE AND WAS

SOLELY REFERENCED TO DIMINISH THE WITNESS'S CREDIBILITY?

IV. WAS THE VERDICT OF THE TRIAL COURT AGAINST THE WEIGHT OF THE EVIDENCE WHERE THE COMMONWEALTH'S ONLY WITNESS TO THE SHOOTING HAD A REDUCED ABILITY TO OBSERVE THE SCENE GIVEN HER DISTANCE AND INADEQUATE LIGHTING AND WAS DIRECTLY CONTRADICTED BY THE ONLY OTHER EYEWITNESS WHO TESTIFIED THAT [APPELLANT] COULD NOT HAVE BEEN THE SHOOTER?

Appellant's brief at 4.[4]

The first claim presented is whether the trial court abused its discretion in allowing the jury to view the crime scene during daylight hours. Appellant argues this was prejudicial because the shooting occurred at night and part of his defense strategy concerning misidentification focused on challenging Cutler's ability to see the shooter, given her distance and the poor lighting conditions. (*Id.* at 17, 21.)

Pursuant to Pennsylvania Rule of Criminal Procedure 643(A), "[t]he trial judge may in the judge's discretion order a view by the jury." Pa.R.Crim.P. 643(A). "Absent an abuse of discretion, the denial of a request for a jury view will not be overturned." *Commonwealth v. McNeil*, 679 A.2d 1253, 1256 (Pa. 1996), *superseded by statute on other grounds as stated in Commonwealth v. Rega*, 933 A.2d 997 (Pa. 2007). "An

---

[4] Additional issues contained in appellant's Rule 1925(b) statement have not been presented in his brief; hence, we deem them to have been abandoned.

abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." ***Commonwealth v. Hoover***, 16 A.3d 1148, 1150 (Pa.Super. 2011).

Instantly, the parties had originally agreed to the jury visiting the crime scene. However, prior to the viewing, defense counsel objected on the basis that it was misleading to allow the jury to view the scene during the daylight as the crime was committed at night. The Commonwealth responded that the reason for the visit was exclusively for the jury to gain a sense of the topography of the location and the jury was aware that the crime occurred at night. (Notes of testimony, 7/16-19/12 at 8-9, 195-196.)

The trial court found the difference in the lighting conditions was not unduly prejudicial and that the jury could extrapolate as much. The court agreed with the Commonwealth that the purpose was to see the landscape of the crime scene in relation to the location of the witness and the victim. (***Id.*** at 197.) The court noted defense counsel could argue to the jury it should view the scene with skepticism, as it did not know the lighting conditions at the time of the murder.

Following a visit to the scene, appellant requested a mistrial, and the request was denied. The trial court explained:

> I understand the position of both of you. What we did was what was requested. We took the jurors to the scene. We had one officer -- one plainclothes detective stand in front of 1551, which I believe was

[Cutler's] residence and the advantage[,] which she says that she was standing on May 11, 2011, at around approximately 10:30 when this occurred.

There was another detective who stood in the area of 1556 where the victim was allegedly shot. No statement was made by any of the attorneys.

The only statement that was made was the statement by me where I informed the jury that the one detective was standing at [Cutler's] residence and the other detective was standing at the site where the victim was found. I allowed all the jurors to walk freely, as I had the street blocked for them to get the trajectory from [Cutler's] view down to where the homicide took place.

There was no testimony, no swaying. It was just an objective view to see if, in fact, it was 20-foot hills, as had been alleged on either side of the street, which, in fact, it wasn't. The elevation wasn't much higher than six feet, if you look at horizontally the rise to the point of the hill on either side of the street.

I think that perhaps the defense at this point may have buyer's remorse in that they understood what was happening. Now that they've seen the scene. I believe, they're uncomfortable about what the jury saw, but I cannot un[-]ring the bell. And I don't believe that there was any undue prejudice done.

There was no way that I could put sunglasses or make the sun go down. Today is a very hot day. It's a sunny day. But the whole thing of our going there was for distance and trajectory. The lighting is something you all can talk to, and you can move the jury however you want with respect to that in terms of their ability to see or their inability to see.

What we were attempting to do was to show distance and trajectory, and I believe that's what is happening. I'm denying the motion for a mistrial.

Notes of testimony, 7/16-19/12 at 298-299.

We find no abuse of discretion. The purpose of a view is to help the fact-finder understand the evidence presented in court and resolve conflicts in testimony. For instance, in **Commonwealth v. Mangini**, 386 A.2d 482 (Pa.Super. 1978), the court denied a defense motion to allow a night viewing of the crime scene and permitted a daytime viewing. The court found that numerous factors, some known and others not known, would have contributed to the amount of illumination on the night in question in the room where the murder occurred. **Id.** at 488. The court noted it would be difficult to reconstruct the exact amount of lighting. **Id.** We find this analysis applicable to the current set of facts; it would be virtually impossible to recreate the lighting conditions that existed on the night of the shooting. Again, the viewing was for the jury to see the topography of the area and to aid in their determination of whether Cutler could see what she testified to observing the evening of the incident. The jury was not led to believe that lighting conditions on the night in question were those represented by the lighting conditions at the viewing.

Furthermore, as the Commonwealth notes, the defense hired a photographer to take photographs at night to show the jury "what the average person's eye would see and the perspective from that point of view." (Notes of testimony 7/16-19/12 at 428.) The photographer took photographs from what he estimated to be the point of view of Cutler

standing in front of her home at night. (*Id.* at 427.) The photographs were displayed and introduced into evidence. Appellant dismisses the jury's ability to discern the difference between night and day. Under the circumstances here presented, appellant has failed to meet his burden of demonstrating an abuse of discretion by the trial judge.

Next, appellant argues that the trial court erred in allowing officers to testify that people do not typically come forward and cooperate with the police. Appellant argues such testimony bolstered and unfairly enhanced the testimony of Cutler by "making her seem like a neighborhood hero." (Appellant's brief at 23.) We find appellant's "vouching" argument wholly misplaced.

Improper bolstering of a witness occurs when the Commonwealth places the prestige of the government behind the witness through personal assurances of his or her veracity, or the Commonwealth indicates that information which is not before the jury supports the witness' testimony. ***Commonwealth v. Hartey***, 621 A.2d 1023, 1026 (Pa.Super. 1993).

We agree with the Commonwealth that Detective Williams' testimony did not mention or refer to Cutler. Nor did the detective's testimony suggest that a witness who comes forward is more credible as a result. The officer merely testified about her course of conduct in the case in processing the crime scene and related it to her 19 years of experience handling homicide investigations. Williams explained how her investigation proceeded and that

she attempted to speak with individuals in the area who came to the aid of the victim or might have witnessed something. As the Commonwealth argued following defense counsel's objection to her testimony:

> In [the defense's] opening he said the entire case is based upon one single witness. [Defense counsel] focused on that for the entire opening. In light of the fact that he was focusing his arguments, I think it would be disingenuous for the jury not to understand the realities of the situation that the detective deals with and it's not uncommon for a single witness to come forward that night or come forward later. It's more than relevant because it goes to show and explain how the investigation proceeded, why there wasn't anyone interviewed until later and why she didn't come forward.

Notes of testimony, 7/16-19/12 at 57-58. No relief is due.

The third issue presented is whether the trial court erred by allowing Detective McGee to testify to his interaction with defense witness Henderson in the Allegheny County Jail. Appellant claims that to state Henderson was in jail prejudiced the jury against him and led the jury to conclude Henderson was not a credible witness. (Appellant's brief at 30.)

> The admissibility of evidence is within the sound discretion of the trial court, wherein lies the duty to balance the evidentiary value of each piece of evidence against the dangers of unfair prejudice, inflaming the passions of the jury, or confusing the jury. We will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion.

***Commonwealth v. Ruffin***, 10 A.3d 336, 341 (Pa.Super. 2010) (citations omitted).

Appellant's argument centers on case law which holds the veracity of a witness may not be impeached by prior arrests which have not led to convictions. *Commonwealth v. Jackson*, 381 A.2d 438, 439 (Pa. 1977). However, appellant ignores the fact that Henderson's credibility was later attacked by his own volition. The court's action, in permitting the detective to testify that he tracked down Henderson in jail, was not overly prejudicial in light of the fact that Henderson admitted on cross-examination that he had previously pled guilty to the crimes of providing false identification to a police officer and intimidation of a witness; this trumps any taint provided by the jury knowing Henderson was in jail.

Detective McGee testified to the efforts put forth with the investigation. He explained the police attempted to locate and question several potential witnesses, but they were unable to contact these individuals. (Notes of testimony, 7/16-19/12 at 357-359.) As the trial court explained to counsel, "part of the history of the case is location of witnesses. [The jury] already heard testimony about a bench warrant. I think the fact they were able to locate him in that location is completely relevant as to how they located him." (*Id.* at 351-362.) Henderson's location in jail when first approached by the police did not prejudice appellant to the point that he was denied a fair and impartial trial; we find no mistrial was warranted. Accordingly, this claim must fail.

In his final issue, appellant attacks the weight of the evidence. Appellant draws our attention to Cutler's identification testimony and underscores the lighting conditions and distance from which she observed the crimes. Appellant claims these factors make the identification testimony unreliable.

Our standard of review is as follows.

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained[,] [t]he term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record

> shows that the action is a result of partiality, prejudice, bias or ill-will.

***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis omitted) (citations omitted).

Here, the trial court's refusal to grant a new trial on the weight of the evidence challenge was not an abuse of discretion. The trial court explains that it found Cutler's eyewitness account to be credible. (Trial court opinion, 1/6/14 at 3.) Again, Cutler, who was well acquainted with appellant, identified appellant as the person who fired the gun and fatally shot the victim. Cutler was present during the initial confrontation between the men and testified that appellant later returned with a gun and shot the victim in the chin. From the same viewpoint, Cutler identified Henderson. Mr. Henderson, by his own admission was with the victim when he was shot. While appellant argued her testimony was incredible due to the lighting conditions and the distance at which she observed the shooting, such credibility determinations are for the finder-of-fact. ***Commonwealth v. Lark***, 91 A.3d 165, 173 (Pa.Super. 2014) (credibility determinations are exclusively for the finder of fact). The jury heard all of the evidence regarding her identification, factors that could have impeded her view and visited the scene of the crime. The jury was free to assign whatever weight they deemed appropriate to the testimony of each witness, including Cutler.

Evidence was also presented that appellant fled to Detroit, allowing the jury to conclude consciousness of guilt. ***See Commonwealth v.***

***Houseman***, 986 A.2d 822, 831 (Pa. 2009) (flight and concealment after a crime can constitute circumstantial evidence consciousness of guilt). The jury weighed the evidence, along with the other evidence presented, and returned verdicts of guilty as to the crimes charged. Consequently, this issue is meritless.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/2015