J-A12033-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARKEL DAVIS, | |
| Appellant | No. 2489 EDA 2014 |

Appeal from the Judgment of Sentence August 8, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0014344-2013

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JUNE 09, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction by a jury on the charges of aggravated assault, carrying a firearm without a license, carrying firearms in public in Philadelphia, possessing an instrument of crime, and conspiracy.[1]  Appellant contends (1) the evidence was insufficient to sustain his convictions; (2) the suppression court erred in failing to suppress the victim's out-of-court identification of Appellant as the

---

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 6106(a)(1), 6108, 907(a), and 903(c), respectively.  The jury acquitted Appellant on the charges of attempted murder, 18 Pa.C.S.A. § 901(a), and conspiracy (to commit attempted murder), 18 Pa.C.S.A. § 903(c).

*Former Justice specially assigned to the Superior Court.

shooter; and (3) the trial court erred in failing to give a **Kloiber**[2] instruction.[3] We affirm.

The relevant facts and procedural history are as follows: Following the shooting of Enrico Lofton ("Lofton"), Appellant was arrested, and, on March 19, 2014, he filed a counseled, pre-trial motion seeking, *inter alia*, to suppress Lofton's out-of-court identification of Appellant as the shooter. Specifically, Appellant alleged the circumstances revealed that Lofton did not observe the person who shot him, and Lofton chose Appellant's photo from a photo array solely because of unnecessarily suggestive police procedures. **See** Appellant's Motion, filed 3/19/14, at 5-8.

On May 5, 2014, the suppression court held a hearing, at which Lofton and Detective John Landis, the officer who had conducted the photo array, testified. Specifically, Lofton testified that, on September 9, 2013, he was shot. N.T., 5/5/14, at 21-22. He indicated that, two weeks prior to the shooting, his paramour's mother talked to him about her fifteen-year-old son, Carlos, selling illegal drugs. **Id.** at 22-23. She asked Lofton to talk to Carlos, and after he did so, Carlos took him to Mifflin Street during the daylight hours and pointed out the two men for whom he was selling drugs. **Id.** at 23-24. Lofton approached the two men, stood face to face with them, and told them to leave Carlos alone. **Id.** at 24-25. The men agreed;

---

[2] **Commonwealth v. Kloiber**, 378 Pa. 412, 106 A.2d 820 (1954).
[3] We have renumbered Appellant's issues for ease of discussion.

however, during the evening of September 9, 2013, Lofton saw the two men with Carlos outside of Carlos' house. *Id.* at 26-28. Lofton testified that, in the street where there were lights, he exchanged words with the two men, whose faces were not covered. *Id.* at 28, 35, 45. He indicated the two men were disrespecting him, and after about five minutes, the men started to ride off together on bikes but within a few seconds one of them shot him. *Id.* at 29, 45.

After he was shot, the police took him to the hospital, and they showed him two photo arrays. *Id.* at 30-31. Lofton relevantly testified as follows regarding the photo arrays:

> **[ADA]:** Do you remember how many photo arrays they showed you?
> **THE COURT:** Why don't you explain what a photo array is.
> **[ADA]:** So a photo array is a piece of paper with eight pictures on it.
> **[LOFTON]:** I know.
> **[ADA]:** You know. Do you remember if from the first photo array [ ] you identified anybody?
> **[LOFTON]:** I really don't remember. I was a little medicated. Percocet.
> **[ADA]:** Do you remember recognizing faces?
> **[LOFTON]:** Yeah.
> **[ADA]:** Do you remember if you identified the person that was the shooter?
> **[LOFTON]:** Yeah.
> **[ADA]:** And did you identify the other person that was out there as well?
> **[LOFTON]:** Yeah.
> **[ADA]:** Did you know either of their names?
> **[LOFTON]:** No.
> **[ADA]:** And did you—how did you memorialize your identification? In other words, did you circle anything? Did you write your name? Do you remember that?
> **[LOFTON]:** I just circled the picture. That was it.

> **[ADA]:** Okay.
>
> ***
>
> **[ADA]:** Did you circle a picture in each of the photo arrays that you were shown?
> **[LOFTON]:** Yeah.
> **[ADA]:** And that was shown to you by Detective Landis and Detective Ferry?
> **[LOFTON]:** Yeah.
> **[ADA]:** Did they say anything else to you when they showed you those photo arrays?
> **[LOFTON]:** That was it.  They showed me the photos to identify anybody that was out there and circle the picture.
> **[ADA]:** And how sure were you that those were the two people that were out there and shot at you?
> **[LOFTON]:** I'm good with faces.
>
> ***
>
> **THE COURT:** Did the police tell you who to identify?
> **[LOFTON]:** No.

*Id.* at 30-32.

On cross-examination, Lofton admitted that, when he was shot, he was on probation for prior drug dealing convictions.  *Id.* at 34-35.  Lofton indicated that he was shot in the street, and he denied that he was shot in an alley.  *Id.* at 35.  He denied telling the police that both men involved in the shooting had beards.  *Id.* at 36.  However, he indicated he told the police that one man was heavy set with brown skin and a beard, while the other man was skinny with light skin.  *Id.* at 43.

Lofton testified that, after he gave a description of the men to the police, they returned with photo arrays, and when the police showed him the photo arrays, they simply said "identify anybody that was out there."  *Id.* at 36-37, 44.  Lofton admitted he looked at the photo arrays for about fifteen minutes before he circled the photos of Appellant and his cohort, Nafeese

- 4 -

Turner ("Turner"); however, he explained that he was medicated. *Id.* at 38-39. Lofton indicated that, during the time he looked at the photo arrays, the police just said, "identify anybody that was out there." *Id.* at 38. After Lofton circled Appellant's and Turner's photos, the police asked him if he "was sure," to which Lofton replied, "Yeah." *Id.* at 43. Lofton denied that, prior to circling the photographs, the police mentioned the fact he was being charged with new drug crimes. *Id.*

On redirect-examination, Lofton admitted that he was guessing as to the length of time he looked at the photo arrays before choosing Appellant's and Turner's photos. *Id.* at 46-47. He noted he was sluggish from the medication. *Id.*

Detective Landis testified he did not take a formal statement from Lofton on the day of the shooting; however, he returned to the hospital the next day with his partner. *Id.* at 54-55. Based on the investigation, he prepared two colored photo arrays, each containing eight photographs. *Id.* at 55-56. Detective Landis showed Lofton the photo arrays and asked him if he recognized anyone in the photo arrays. *Id.* at 56. Detective Landis testified that, when he showed Lofton the first photo array, "[h]e immediately pointed on the first [array] to [Appellant], who was positioned, I believe, bottom row, second from the far right." *Id.* Lofton circled Appellant's photo and signed his name next to it. *Id.* at 56-57, 60. Lofton then indicated "[h]e's the guy that shot me last night." *Id.* at 61.

Additionally, when Detective Landis showed Lofton the second photo array, Lofton circled Turner's photo and signed his name next to it. ***Id.*** at 63.

Detective Landis indicated that, after he showed Lofton the photo arrays, he took a formal statement of the shooting from him. ***Id.*** Detective Landis indicated that, when he showed Lofton the photo arrays and spoke to him, Lofton was "very coherent" and understood what he was being asked. ***Id.*** at 64.

On cross-examination, Detective Landis indicated that he prepared the photo arrays based on neighborhood interviews, processing the crime scene, collecting evidence, and "the intel he had at the time[.]" ***Id.*** at 66, 70. He further indicated he had spoken to other officers about the case and was aware of the responding officers' broadcasting of general descriptions. ***Id.*** at 68-69. He testified that he could not remember "off the top of [his] head" the precise descriptions provided by the responding officers. ***Id.*** at 69. Also, he indicated that, following the shooting, the police received a phone call in which the caller provided the police with the name of two suspects, Markel and Duda. ***Id.*** at 70-71.

Detective Landis then testified as follows:

> **[DEFENSE COUNSEL]:** So the information you had was that somebody named Markel was a suspect?
> **[DETECTIVE LANDIS]:** Correct.
> \*\*\*
> **[DEFENSE COUNSEL]:** How did you end up with these pictures on these pieces of paper?
> **THE COURT:** Okay. And if I can clarify and add to it, I think [defense counsel] is also asking from the name of Markel,

how do you—from the first name of Markel, how did you then come up with both [Appellant] and also all the other people in the photo spread? Is that basically your question?

**[DEFENSE COUNSEL]:** Yes.

**THE COURT:** Okay.

**[DETECTIVE LANDIS]:** Well, we went through the database of the targeted area. Then we went through all the Markels from that targeted area. Then when [w]e went to the description of each person, does it meet the actual description of our target based on intel and the information we have of who this possible shooter is. That's where we develop [Appellant].

As far as Duda went, we have an intel database that we keep in-house for nicknames.

\*\*\*

**[DEFENSE COUNSEL]:** So when you created the photo arrays that I believe is marked C-1 with [Appellant] in it—

**[DETECTIVE LANDIS]:** Correct.

**[DEFENSE COUNSEL]:**--you put in your database the name Markel and a description?

**[DETECTIVE LANDIS]:** No.

**[DEFENSE COUNSEL]:** No?

**[DETECTIVE LANDIS]:** Once I identify a target or subject—

**[DEFENSE COUNSEL]:** Right.

**[DETECTIVE LANDIS]:** --I put him—once I identify him, I put him in there. Then I go get seven additional guys that look like him, normally not from that [*sic*] the area.

**[DEFENSE COUNSEL]:** Okay. So before you put this picture of [Appellant] in the photo array marked as C-1 you had already identified him as a suspect?

**[DETECTIVE LANDIS]:** As a suspect target, yes.

**[DEFENSE COUNSEL]:** Okay. What information did you use to identify him as a suspect before you put him in the photo array?

\*\*\*

**[DETECTIVE LANDIS]:** The information received from the investigation, the two nicknames, that's what we went with.

*Id.* at 71-74.

Following the hearing, the suppression court denied Appellant's motion, and Appellant proceeded to a jury trial with Turner as his co-

defendant.  At trial, the Commonwealth offered the testimony of several witnesses; however, the defense offered no witnesses.

Specifically, Police Officer Robert Ellis testified that, on September 9, 2013, he was on patrol with his partner, Police Officer Cyrus Pollard, when they received a radio call for shots fired initially "in the 1800 block of Corlies Street, and then. . .3018 Mifflin Street[,]" which is in a "nice neighborhood." N.T., 5/7/14, at 139, 148.  Officer Ellis testified the officers arrived at the 3018 Mifflin Street residence within three to five minutes of receiving the radio call, and they were the third police vehicle to arrive.  *Id.* at 140. Officer Ellis exited the police vehicle and followed other responding officers into the house where he immediately noticed Lofton had been shot in the arm.  *Id.* at 141.  Lofton yelled out, "I was in a[n] argument."  *Id.* at 170, 176.  Officer Ellis also observed a male teenager, who was small, thin, and light-skinned, inside of the house.  *Id.* at 141, 144.  However, since Lofton was clearly in pain and bleeding profusely, Officer Ellis' focus remained on Lofton.  *Id.* at 141-143.  Officer Ellis assisted Lofton to a police vehicle and then transported him to the hospital, where hospital personnel discovered narcotics on Lofton's person.  *Id.* at 145.

Officer Ellis indicated that, during the transport, Lofton said he was shot in the driveway of 1818 Corlies Street, which is approximately 150 feet from 3018 Mifflin Street, and his "little brother" was with him during the shooting.  *Id.* at 150-51, 164.  Upon arrival at the hospital, Lofton provided

the police with a description of two men, who were involved in the shooting. *Id.* at 166-67, 176. Specifically, Lofton told the officers two black males were involved, both of whom wore dark clothing. *Id.* at 167. Lofton further indicated one of the men was approximately 5'10" tall, weighed approximately 180 pounds, and had a full beard. *Id.* Lofton then asked the officers if his "little brother" was still in the house, and Officer Ellis assumed he was talking about the teenager he had noticed previously in the house. *Id.* at 164. Officer Ellis and his partner immediately radioed to their fellow officers all of the information that they had gathered from Lofton. *Id.* at 167.

Officer Pollard confirmed that upon arrival Officer Ellis ran into the house at 3018 Mifflin Street; however, he remained outside. *Id.* at 179. At the hospital, he was present when a package of narcotics fell out of Lofton's pocket as hospital personnel were cutting off his clothes. *Id.* at 181.

Lofton testified he was convicted of "dealing heroin" in 2011 and 2012, and he was on probation when he was shot on September 9, 2013. N.T., 5/8/14, at 23-24. Lofton testified that he spent a lot of time with his paramour, and he treated her fifteen-year-old brother, Carlos, as his little brother. *Id.* at 25-27. He indicated he took Carlos "under [his] wing like [a] little brother." *Id.* at 27.

At some point, Lofton's paramour's mother talked to him about the fact Carlos was "running the streets and selling drugs." *Id.* Because Lofton

did not want to see Carlos follow in his footsteps, he talked to the teenager, who told him the people for whom he was selling drugs. *Id.* at 27-28. Carlos also turned over to Lofton a pack of crack cocaine, which the men had given him to sell. *Id.* at 30.

Lofton decided to confront the men, so about two weeks prior to the shooting, during the daylight hours, he travelled with Carlos to Mifflin Street. Carlos then pointed out the two people for whom he was selling drugs. *Id.* at 28-29. Lofton confirmed the two men to which Carlos pointed were Appellant and Turner. *Id.* at 29.

Lofton testified he walked up to the two men, stood four feet from them, told them to leave Carlos alone because he was "too young for the business," and gave them back the crack cocaine. *Id.* at 30-31. Lofton indicated the two men were standing "side by side," he could clearly see their faces, and when he told them to leave the teenager alone, Appellant said he "respected that." *Id.* at 32. Lofton said he then "fist bumped" the two men and left the conversation on good terms. *Id.* at 33.

However, two weeks later, Lofton was inside the residence at 3018 Mifflin Street watching a football game when he heard a commotion going on outside. *Id.* at 34. He went outside and saw Carlos standing with Appellant and Turner. *Id.* Lofton then testified the following occurred:

> **Q:** And what did you do when you went outside?
> **A:** Confronted them again.
> ***
> **Q:** What did you say?

- 10 -

**A:** We started arguing back and forth.

\*\*\*

**Q:** Carlos there?

**A:** Yes.

**Q:** And what did you find out at that time?

**A:** That he gave Carlos something.

**Q:** I can't understand you.

**A:** He gave Carlos drugs, and I asked Carlos where it's at, and he acted like he didn't want to give it to me, so I took it from him.

**THE COURT:** I'm sorry. I didn't hear that.

**Q:** You [have] to speak up, [Lofton].

**A:** What I say—I said I guess they gave Carlos drugs again, and I asked Carlos where was it at, and he said he's not giving it to me. So I checked Carlos and I took it from him.

**Q:** Did Carlos have drugs on him?

**A:** Yes.

**Q:** What kind of drugs did he have on him then?

**A:** Heroin.

**Q:** Anything else?

**A:** Crack.

**Q:** And where was it that you took [the drugs] from him?

**A:** His waistband.

**Q:** Did he tell you—did Carlos tell you anything about what they were arguing over?

**A:** No.

\*\*\*

**Q:** So you took the drugs from Carlos. What did you do with them?

**A:** I told them they ain't getting them back.

**Q:** You told who they ain't getting them back?

**A:** Those two.

**Q:** Indicating the defendants, [Appellant and Turner]?

**A:** Yes.

**Q:** What did they do—or what did they say when you said that?

**A:** They said, who the fuck I think I am, and that's when I said—

**Q:** I need you to talk—

**A:** They asked who the fuck do I think I am, and I asked who the fuck they think they be.

**Q:** Okay. So then what happened?

**A:** I don't remember, just standing there, but—I forgot what they said, but that's when they rode off and I walked off. And shots were fired.

**Q:** Who said that? Who said, "Who the F do you think you are?"

**A:** I believe [Turner].

**Q:** [Turner] said that? Did [Appellant] say anything?

**A:** No. He just looking stupid.

**Q:** I'm sorry.

**A:** He looking stupid.

**Q:** How far apart were they when [Turner] said that?

**A:** Side by side, I guess. Side by side.

**Q:** Side by side?

**A:** Yes.

*** 

**Q:** I'm going to ask you again to tell me when to stop as I walk closer when how far—close they were—

**A:** Where you were there before.

**Q:** Same spot?

**A:** Same spot.

**Q:** About four feet away from you?

**A:** Yes.

**Q:** Were they both side by side then?

**A:** Yes.

**Q:** Anything covering their faces?

**A:** No.

**Q:** Were there lights on where you were?

**A:** Street lights.

**Q:** Okay. What did they say to you, if anything, about the drugs that you took from Carlos?

**A:** I guess they wanted it back, and I told them they ain't getting shit back.

**Q:** When you say "guess," were they asking for it back?

**A:** Yeah.

**Q:** Which one asked for it back?

**A:** [Appellant].

**Q:** [Appellant]?

**A:** Yeah.

**Q:** What did [Turner], if anything, say about the drugs?

**A:** Start[ed] running his mouth or something.

**Q:** Okay. Well, I know you already said he was just running his mouth. What was he saying?

**A:** Shit-talking.

**Q:** Like what?

- 12 -

**A:** Cosigning and everything.  Cosigning.

**Q:** Cosigning?

**A:** Whatever [Appellant] say, he was cosigning.

**Q:** So [Turner] would repeat what[ever] [Appellant] was saying?

**A:** Yeah, something like that.

**Q:** Saying the same exact thing or something different?

**A:** No, something different. . .different way.

**Q:** Can you tell the jury what you heard [Turner] saying?

**A:** I don't remember right now.

**Q:** What do you remember [Appellant] saying?

**A:** "We want our shit back."  I said, " You ain't getting your shit back."  And he said, "We got something for you."  I said, "Come on with it."

**Q:** They said they got something for you?

**A:** Yeah.

**Q:** Which one said that?

**A:** [Appellant].

**Q:** Did [Turner] say anything along those lines?

**A:** No, he just looking dumb.

**Q:** Okay. How far apart was [Turner] standing when [Appellant] said that?

**A:** They was side by side.

**Q:** How long was, as you call it, that "shit-talking" going on?

**A:** Like five minutes.

*Id.* at 35-42.

Lofton testified he told the men he was going to flush the narcotics down the toilet, and they became upset.  *Id.* at 43.  Lofton watched as the two men, who were "side by side," started to ride off on their bikes, and as he began to walk away in the opposite direction, he turned in time to see Appellant shooting in his direction.  *Id.* at 45.  One of the bullets struck Lofton in the front of his right bicep, and after he went into the house, his paramour telephoned the police.  *Id.* at 47.

- 13 -

Prior to the shooting, Lofton did not observe either of the two men in possession of the handgun. *Id.* at 49. He noted that both Appellant and Turner were wearing black hoodies; however, Appellant's hoodie had a picture on it. *Id.* at 42. At trial, Lofton positively identified a hoodie, which the police had seized from Appellant's home, as the hoodie Appellant had been wearing when he shot Lofton. *Id.* at 70-71, 176-78.

Lofton testified that, the day after the shooting, he picked out Appellant's and Turner's photos from police photo arrays. *Id.* at 56-57. Also, on that date, he gave a statement to the police indicating Appellant shot him, but that Turner was with him and had done "all of the talking." *Id.* at 58-64. At trial, Lofton again identified Appellant as the man who shot him, and Turner as the man who was "with him talking shit when [he was] shot." *Id.* at 69. He further indicated that, when he told the men he was not giving the narcotics back to them, Appellant said, "We got something for you[,]" and Turner said to Appellant, "Say no more." *Id.* at 106.

Detective Michael Ferry testified the shooting occurred at 1818 South Corlies Street, and the police found three 9 millimeter fired cartridge casings in the vicinity. *Id.* at 120-21.

Detective Landis confirmed that, the day after the shooting, Lofton chose Appellant's and Turner's photos from photo arrays. *Id.* at 160. Specifically, he confirmed Lofton chose Appellant as the shooter, and he

chose Turner as the person with Appellant and "doing all the talking." *Id.* at 164-65.

The Commonwealth offered into evidence various stipulations made between the parties, including the fact that neither Appellant nor Turner had a valid license to carry a firearm. N.T., 5/9/14, at 65-66.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*, and the trial court sentenced Appellant to an aggregate of twelve years to twenty-four years in prison. This timely, counseled appeal followed,[4] and all Pa.R.A.P. 1925 requirements have been met.

In his first issue, Appellant contends the evidence was insufficient to sustain his convictions. Specifically, he alleges the testimony from the lone eyewitness, Lofton, which identified him as being involved in the shooting, was so inherently unreliable and contradictory that the verdict could only have come from speculation and conjecture. *See Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993) (indicating where testimony of the victim is so unreliable and contradictory that it is incapable of supporting a verdict of guilty, the evidence is insufficient as a matter of law).

> The standard we apply when reviewing the sufficiency of
> the evidence is whether viewing all the evidence admitted at trial

---

[4] Turner, who was also convicted and sentenced on numerous charges in connection with the shooting, has filed a separate appeal. His appeal is docketed at 2601 EDA 2014 and shall be addressed in a separate decision.

in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Slocum*, 86 A.3d 272, 275-76 (Pa.Super. 2014) (quotation and citation omitted).

As indicated *supra*, Appellant's argument is specific in nature. Rather than challenging the sufficiency of the evidence to support any of the applicable elements of the offenses, Appellant contends the evidence was insufficient to prove that he was the shooter or even one of the two men involved in the shooting. As such, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the

elements of the offenses have been met. Rather, we will focus on the specific sufficiency issue raised by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator.

This Court has recognized that:

> [E]vidence of identification need not be positive and certain to sustain a conviction. **Commonwealth v. S. Jones**, 954 A.2d 1194, 1197 (Pa.Super. 2008)[.] Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. **Commonwealth v. Minnis**, 458 A.2d 231, 233–34 (Pa.Super. 1983). Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. **Id.** at 234. Given additional evidentiary circumstances, "any indefiniteness and uncertainty in the identification testimony goes to its weight." **Id.** at 233.

**Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa.Super. 2011) (*en banc*) (quotation marks omitted).

Here, in rejecting Appellant's sufficiency of the evidence claim, the trial judge, the Honorable Denis P. Cohen, stated the following:

> In the instant case, [Lofton], an eyewitness to the shooting, unequivocally identified [Appellant] at trial as. . .the shooter. Despite extensive cross-examination, [Lofton] never waivered. [Lofton] testified that he walked up close to [Appellant and Turner] (approximately four feet away), that the streetlights were on, that nothing was covering [Appellant's] face, that [Appellant and Turner] were standing side-by-side, that he argued with [Appellant and Turner] for several minutes about Carlos' drug dealing, and that [Appellant] was wearing a black hoodie with a picture on the front and back. Once the argument ended, [Lofton] testified that he watched [Appellant and Turner] ride away together for a short while, that nobody else was in the area that [Appellant and Turner] were riding, and

- 17 -

that, when he heard the gunshots, he turned and saw a flash coming from [Appellant's] direction.

Four days after the shooting, the black hoodie that [Appellant] was wearing the night of the shooting was recovered from [Appellant's] home, and [Lofton] recognized the hoodie at trial as the hoodie that [Appellant] was wearing on the night of the shooting. Additionally, according to both [Lofton] and Detective Landis, the day after the shooting [Lofton] unequivocally identified [Appellant] as. . .the shooter[ ] from a photo array, and stated specifically that [Appellant] was "the guy who shot me last night."

[Lofton's] testimony is further corroborated by the fact that the flash description that he provided to Officer Pollard on the night of the shooting was consistent with [Appellant's] physical characteristics a few days after the shooting. Specifically, on the night of the shooting, [Lofton] indicated that the shooters were two black males wearing dark clothing, one of whom was approximately 5'10", 180 pounds, with a full beard. According to the arresting officer, four days after the shooting (the day [Appellant] was arrested) [Appellant] "looked like he hadn't shaven for at least a week or so" and there was facial hair "all over his face" such that no "part of [Appellant's] face was shaven." (N.T., 5/9/14, at 58-61).

Finally, [Lofton's] identification was corroborated by the fact that, in addition to arguing with [Appellant and Turner] about Carlos on the night of the shooting, [Lofton] had met with [the men] only two weeks prior to the shooting to discuss Carlos' drug dealing. [Lofton's] meeting with [Appellant] two weeks prior to the shooting occurred during the day, and [Lofton] testified [Appellant] was standing approximately four feet away, face uncovered, side-by-side with [Turner].

While [Appellant] challenges the fact that immediately after being shot and before taken to the hospital, [Lofton] first told the police that he did not know what happened, such initial uncertainty in the identification goes to the weight of the evidence, not the sufficiency of the evidence. *See Orr*, 38 A.3d at 874 ("Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.")[.] Therefore, the Commonwealth presented. . .sufficient evidence that [Appellant] was the shooter.

- 18 -

Trial Court Pa.R.A.P. 1925(a) Opinion, filed 6/5/15, at 14-16 (citations to record omitted).

We agree with the trial court's reasoning in this regard and find no merit to Appellant's first issue.

In his second issue, Appellant contends the suppression court erred in denying his pre-trial motion seeking to suppress Lofton's out-of-court identification of Appellant as the shooter. In this vein, he alleges the circumstances revealed that Lofton did not observe the person who shot him, and he did not identify Appellant as the shooter until after he viewed an unnecessarily suggestive photo array. *See* Appellant's Brief at 22. Appellant suggests the photographic identification procedure was conducted in a suggestive manner by virtue of the fact "the arrays were not created using any description Lofton may have provided to the police." *See id.* at 23. Moreover, he argues the "procedure was additionally suggestive because it was done while Lofton was facing new drug charges while already on probation for two drug dealing felonies, and [while Lofton] was under the influence of Percocet [in the hospital]." *See id.* at 24.

Initially, we note:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. . . .Where the suppression court's

- 19 -

factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where. . .the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783–84 (Pa.Super. 2012) (quotations omitted). *See Commonwealth v. Benton*, 655 A.2d 1030 (Pa.Super. 1995) (indicating it is within the suppression court's sole province to make credibility determinations). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073, 1087 (2013).

When analyzing the admission of identification evidence, a suppression court must determine whether the challenged identification has sufficient indicia of reliability[.] This question is examined by focusing on the totality of the circumstances surrounding the identification. In deciding the reliability of an identification, a suppression court should evaluate the opportunity of the witness to see the criminal at the time the crime occurred, the witness's degree of attention, the accuracy of any description given, the level of certainty when identification takes place, and the period between the crime and the identification.

*Commonwealth v. Sanders*, 42 A.3d 325, 330 (Pa.Super. 2012) (quotation marks, quotation, and citation omitted).

Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. Identification evidence will not be suppressed unless the facts

- 20 -

demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Photographs used in [arrays] are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics.

*Commonwealth v. Fulmore*, 25 A.3d 340, 346 (Pa.Super. 2011) (quotations and quotation marks omitted). "Additionally, [we note] the purpose of a suppression order regarding exclusion of identification evidence is to prevent improper police action. Thus, where [an appellant] does not show that improper police conduct resulted in a suggestive identification, suppression is not warranted." *Commonwealth v. Jaynes*, 2016 WL 805572, *2 (Pa.Super. filed Mar. 1, 2016) (quotation marks, quotations, and emphasis omitted).

In addressing Appellant's claim, the suppression court indicated the following:

> As an initial matter, [Appellant's] claim fails because he does not allege that the police conduct-that is, any *procedure* used by the police-was suggestive. As stated recently. . .in [ ] *Sanders*, 42 A.3d [at] 331 [ ], "the purpose of a suppression order regarding exclusion of identification evidence is to prevent improper police action. Thus, where [an appellant] does not show that improper police conduct resulted in a suggestive identification, suppression is not warranted."
>
> At best, based upon a plain reading of [Appellant's argument], the only police *procedure* that [Appellant] alleged had any impact on [Lofton's] identification was the use of a photo-array that did not reflect [Lofton's] initial description of [Appellant] to the police. Such a challenge to police procedures fails as a matter of law; the Superior Court has consistently stated that "there is no merit to the argument the identification process was unduly suggestive because the photos did not match the victim's description of [the] assailant." *In re Love*,

646 A.2d 1233, 1237 (Pa.Super. 1994); *see also* [***Fulmore***, ***supra***]. Likewise, while [Appellant] also argues that the photo identification was unnecessarily suggestive because [Lofton] was medicated and looked at the photograph for fifteen minutes, such an argument relates to the *condition* of the victim and therefore goes to the weight of the evidence rather than its admissibility. ***See Sanders***, 42 A.3d at 331 (holding that allegations that the victim was not "sufficiently cogent and lucid" to make a pretrial identification go to the weight of the evidence and not the admissibility of the identification). Therefore, since in this case [Appellant] has not alleged the police conduct was suggestive of the identification, "no improper police conduct is to be deterred," and the pretrial identification was properly admitted.

In any event, the police conduct in the instant case was not suggestive at all. "Suggestiveness arises when the police employ an identification procedure that emphasizes or singles-out a suspect." ***Commonwealth v. Davis***, 17 A.3d 390, 394 (Pa.Super. 2011). In the case *sub judice*, [Lofton] testified that when he first met detectives (Detectives Landis and Ferry) at the hospital, the detectives asked him to identify the shooters, but that otherwise the detectives did not say anything to [Lofton] about the case. Thereafter, the detectives returned the next night with two arrays of eight photos each and asked [Lofton] to identify the shooters. [Lofton] then testified that he looked at the photographs for what seemed like fifteen minutes and identified [Appellant] as the shooter[ ]. While [Lofton] was looking at the photo arrays, the detective did not say anything to [him] other than to identify the shooters. When [Lofton] identified [Appellant] in the first photo array, the detective asked [him] "where do you recognize that person from" and [Lofton] responded "he's the guy that shot me last night."

Notably, nothing in the pretrial. . .record supports any contention that the procedure[s] used by the detectives emphasized or singled out [Appellant]. On the contrary, the record indicates that on the night after the shooting the detectives, before questioning [Lofton], merely showed [Lofton] an eight person photo array and patiently awaited [his] identification of the shooter. Therefore, the police conduct here was not unduly suggestive and th[e] [c]ourt did not err in denying [Appellant's] pretrial motion to suppress the pretrial identification of [Appellant].

Trial Court Pa.R.A.P. 1925(a) Opinion, filed 6/5/15, at 8-10 (emphasis in original) (citations and footnotes omitted).[5]

We agree with the suppression court's reasoning in this regard. Moreover, we note the record does not support Appellant's contention that the circumstances of the crime were such that Lofton was unable to make a reliable identification of Appellant for lack of opportunity. For instance, Lofton testified at the suppression hearing that he had met Appellant and Turner a few weeks prior to the shooting during the daylight hours. N.T., 5/5/14, at 23-25. Lofton further testified that, on the night of the shooting, he stood face to face with Appellant and Turner, engaging in a conversation for five minutes. *Id.* at 28, 35, 45. During this time, the men's faces were lit by the street lights and not covered. *Id.* Lofton indicated he was shot by Appellant within a few seconds of walking away from the men. *Id.* at 29, 45.

Furthermore, with regard to Appellant's argument that Lofton's out-of-court identification was suggestive since it was done while Lofton was facing new drug charges while he was on probation, we conclude such would affect the weight to be accorded the identification at trial, but would not preclude

---

[5] As the suppression court noted, there is no indication the photo array itself was unduly suggestive, and Appellant presented no argument in this regard. *See* Trial Court Pa.R.A.P. 1925(a) Opinion, filed 6/5/15, at 10 n.15. The suppression court found "Appellant's picture did not stand out from the seven other photos and each of the photos depicted individuals with similar characteristics as Appellant." *Id.*

J-A12033-16

its admissibility.  ***See Sanders***, ***supra***.  Accordingly, we conclude Appellant

is not entitled to relief on his second claim.

In his third issue, Appellant argues the trial court erred in failing to

give a ***Kloiber*** instruction[6] to the jury.

> Initially, we note that "[i]t is a bedrock appellate principle that 'issues not raised in the lower court are waived and cannot be raised for the first time on appeal.' 'A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of.' " ***Commonwealth v. Sanchez***, 623 Pa. 253, 82 A.3d 943, 978 (2013), *cert. denied,* ___ U.S. ___, 135 S.Ct. 154, 190 L.Ed.2d 113 (2014) (quotations omitted).  Moreover, [our Supreme] Court has held, in the criminal trial context, "the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points." ***Commonwealth v. Pressley***, 584 Pa. 624, 632, 887 A.2d 220, 225 (2005) (footnote omitted).

***Commonwealth v. Hitcho***, ___ Pa. ___, 123 A.3d 731, 756 (2015).

In the case *sub judice*, our review of the record confirms that, prior to

the trial court charging the jury, Appellant's counsel requested a ***Kloiber***

instruction; however, noting the Commonwealth's requested instruction

---

[6] "A ***Kloiber*** instruction informs the jury that an eyewitness identification should be viewed with caution when either the witness did not have an opportunity to view the defendant clearly, equivocated on the identification of the defendant, or has had difficulties identifying the defendant on prior occasions." ***Sanders***, 42 A.3d at 332 (Pa.Super. 2012) (citation and footnote omitted).

- 24 -

sufficiently addressed the issue, the trial court declined to give Appellant's counsel's requested instruction. N.T., 5/9/14, at 42-45. In response, Appellant's counsel said, "Thank you, Your Honor." *Id.* at 45. Thereafter, upon completion of the trial court's charge to the jury, the trial court asked all counsel whether they had "[a]ny suggestions[,]" to which Appellant's counsel replied, "I have none, Your Honor." *Id.* at 168. As is evident, Appellant made no specific objection or exception to the charge or the trial court's ruling respecting the point at issue. *See Pressley*, *supra*. Accordingly, the issue is waived for purposes of appeal.

For all of the foregoing reasons, we affirm Appellant's judgment of sentence.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/9/2016