**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**James FULMORE.**

**Commonwealth of Pennsylvania,**
**Appellant**

v.

**Desean Kingwood.**

Superior Court of Pennsylvania.

Argued Oct. 25, 2010.

Filed June 27, 2011.

Peter Carr, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Samuel Alboum, Philadelphia, for Fulmore, appellee.

Ellen McBennett, Public Defender, for Kingwood, appellee.

BEFORE: FORD ELLIOTT, P.J., GANTMAN and DONOHUE, JJ.

OPINION BY FORD ELLIOTT, P.J.:

This is an appeal by the Commonwealth from orders suppressing the identification of appellees, James Fulmore and Desean Kingwood, as the perpetrators in a shooting.[1] Following careful review, we reverse.[2]

On June 30, 2008, shortly after midnight in Philadelphia, the victim, Joshua Hernandez ("Hernandez"), was walking on Orthodox Street toward Frankford Avenue with a friend, "Dave," when he noticed a car pull up along the curb and stop direct-

---

**1.** Although each appellee filed a separate brief, the issues in both appeals are identical and the Commonwealth has filed a joint brief for each of the above captioned appeals. Consequently, we have chosen to dispose of both appeals in a single decision.

**2.** The Commonwealth's October 6, 2010 motion to correct omissions from the record is denied as moot as the notes of testimony from the April 30, 2009 suppression hearing have subsequently been included in the certified record.

ly under a street light. As he was in the process of texting messages on his cell phone, Hernandez did not pay much attention to the car, or the two men that alighted from the vehicle and then went to the trunk of the vehicle. A short time later, Hernandez took notice as Dave suddenly began running away from him. Hernandez then felt a man grab him; that man would later be identified as appellee, Desean Kingwood ("Kingwood").

Hernandez began to instinctively react in a defensive manner only to be told by Kingwood "don't do it." (Notes of testimony, 7/15/09 at 11.) Hernandez then looked down and observed that Kingwood had a gun placed to Hernandez' hip. Kingwood then began leading Hernandez down the street. Hernandez feared that the assailant was attempting to steer him toward an isolated grass "alley way" so that he could shoot him. This fear prompted Hernandez to attempt to disarm the man. Hernandez grabbed at the gun and the two men wrestled for control of the weapon. The weapon was discharged, which caused both men to momentarily hesitate. When the struggle resumed, Hernandez was able to wrest the gun from his attacker's grip and began running away.

Unfortunately, Hernandez ran directly toward the other man that had been in the car, now standing behind the vehicle. That man would later be identified as appellee, James Fulmore ("Fulmore"). Hernandez passed Fulmore, but instinctively stopped when he heard a gun cocking. Turning toward the sound, Hernandez observed Fulmore, who simply smiled at him, then pointed a gun at him and fired. The projectile struck Hernandez in the stomach and, although he knew he had been struck, Hernandez began approaching the shooter. He then began feeling dizzy and fell to the ground.

The gun happened to be near Hernandez's location, and he made an effort to retrieve the gun, prompting the shooter to yell to his accomplice to kick the gun away. Kingwood kicked the gun from Hernandez and then retrieved it from the ground. Now rearmed, Kingwood stood over Hernandez, pointed his gun at him and pulled the trigger several times; however, the gun apparently jammed and did not fire. The men returned to their vehicle, and the two sped off as Hernandez's friends were running to the scene to assist.

Hernandez was subsequently taken to the Temple University Hospital where he remained hospitalized for several weeks while receiving treatment for a gunshot wound. On July 9, 2008, after Hernandez had recuperated to some degree, Detective John Harrigan visited Hernandez in the hospital and attempted to interview him regarding the shooting. (Notes of testimony, 4/30/09 at 25, 44.) Hernandez, still under medication, indicated that the first assailant was a "skinny," dark skinned black male, 20–24 years old, 6' to 6'1", approximately 175 to 185 pounds, clean shaven with braided hair. (*Id.* at 46.) The second assailant, the man who shot Hernandez, was described simply as a "black male with a fitted hat wearing a black or blue shirt, short hair, had a P on it for Philly maybe, in blue." (*Id.* at 80.) Detective Harrigan asked Hernandez if he would be able to identify the attackers if he saw them again. Hernandez replied, "Maybe. First one who approached." (*Id.* at 79.)

On July 11, 2008, Fulmore and Kingwood were arrested for a robbery that occurred at approximately the same time of day and at approximately the same location as the Hernandez shooting. Additionally, the two men were driving a vehicle similar to that which had been described as involved in the Hernandez shooting.

Believing there was a substantial likelihood that Fulmore and Kingwood were the two men that assaulted Hernandez, Detective Harrigan created two eight-photograph arrays, one of which contained the photograph of Kingwood, the other containing the photograph of Fulmore. Detective Harrigan then took the arrays to Hernandez at Temple Hospital.

Sequentially, Detective Harrigan asked Hernandez to close his eyes, think back upon the incident, look at the arrays, and "tell me which one of these photos comes to mind." (*Id.* at 58.) Hernandez would later testify that Detective Harrigan gave him one array and told him to "pick them out," and then left the room as Hernandez looked over the array and made a selection. (Notes of testimony, 7/15/09 at 71.) Detective Harrigan then repeated the process with the second array. (*Id.*) Hernandez selected an individual from each array, identifying Fulmore and Kingwood, prompting Detective Harrigan to state "Bingo. That's both the guys." (*Id.*)

Fulmore and Kingwood were subsequently arrested and charged with, *inter alia*, attempted murder, aggravated assault, and robbery. A preliminary hearing was held on September 22, 2008, after which the charges were bound over for trial. A motion to suppress was jointly filed on December 15, 2008, alleging, among other things, that the photo array identification and in-court identification at

the preliminary hearing were unduly suggestive and thus unreliable. (Docket # D1.)

A hearing was held on April 30, 2009 as to the photo array identification.[3] On May 20, 2009, the court issued an order granting suppression of the July 19, 2008 out-of-court photo identifications of appellees. (Docket # D2.) Subsequently, on July 2, 2009, the Commonwealth indicated to the court that it was not going to file an interlocutory appeal as of right from the court's May 20, 2009 order, and the Commonwealth requested a hearing date for the "second half of the motion to suppress identification evidence".[4] (Notes of testimony, 7/2/09 at 5.)

On July 15, 2009, the parties appeared for a hearing on the remaining suppression issue which concerned Hernandez's in-court identification of appellees at the preliminary hearing. Hernandez testified at that time, while the testimony received on April 30, 2009 was incorporated by reference. On October 27, 2009 the court issued an order suppressing Hernandez's in-court identification of Kingwood and Fulmore. The court reasoned that the suggestiveness associated with the photo identification tainted the subsequent in-court identification and rendered it inherently unreliable.

On November 25, 2009, the Commonwealth filed a notice of appeal and herein raises two issues for our review:

---

3. The court also heard evidence concerning appellees' motion for release on nominal bail pursuant to Rule 600(E), which the trial court held under advisement. (Notes of testimony, 4/30/09 at 5–20.)

4. [The prosecutor]: Your Honor, we consulted with our appeals unit and I consulted with my supervisors. We've decided not to seek an interlocutory appeal of the Court's order. What I was going to request was a motions date and a trail [sic] date. The motions date would be for the *second half*

*of the motion to suppress identification.* I'd like to present the testimony of Mr. Hernandez for the—to show an independent basis for identification because I believe [the attorney for Defendant Kingwood] and [the attorney for Defendant Fulmore] wish to suppress the in-court identification at the preliminary hearing as well as, I believe, subsequent in-court identifications.

Notes of testimony, 7/2/09 at 5 (emphasis added).

I. Did the lower court err when it suppressed the victim's out-of-court identifications, where the photo arrays shown to him depicted eight men who were substantially similar in appearance, and thus were not so suggestive as to deny the defendants due process of law?

II. Did the lower court err when it suppressed the victim's in-court identifications, where there was no suggestive pre-trial identification procedure, and, in any event, he had an independent basis for his identifications?

Commonwealth's brief at 3.[5]

▆▆▆ Initially, we must define the parameters of our appellate review. Pennsylvania Rule of Appellate Procedure 311(d) permits an appeal as of right by the Commonwealth in a criminal case from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution. *See* Pa.R.A.P. 311(d). "Such certification is required as a means of preventing frivolous appeals and appeals intended solely for delay." *Commonwealth v. Dugger*, 506 Pa. 537, 547, 486 A.2d 382, 386 (1985). The Commonwealth has an absolute right to appeal to test the validity of a pretrial suppression order, where it certifies in good faith the order substantially handicaps or terminates the prosecution. *Commonwealth v. Bender*, 811 A.2d 1016, 1018 (Pa.Super.2002). *See also Commonwealth v. Cosnek*, 575 Pa. 411, 417, 836 A.2d 871, 875 (2003) (stating only prosecution can determine whether suppression

substantially handicaps ability to meet constitutional burden of proving every element of offense at trial). An appeal under Pa.R.A.P. 311(d) must be filed within 30 days of the entry of the trial court order. *See Commonwealth v. Williams*, 893 A.2d 147 (Pa.Super.2006), *appeal denied*, 591 Pa. 735, 921 A.2d 497 (2007) (Commonwealth appeal of trial court's order granting defendant's motion *in limine* was quashed as notice of appeal pursuant to Pa.R.A.P. 311(d) was not timely filed; it was of no moment that the Commonwealth had the right to seek reconsideration of the trial court's decision beyond the 30–day appeal period, as the trial court's ruling was a final order that was immediately appealable). Here, within its timely notice of appeal from the October 27, 2009 order, the Commonwealth certified in good faith that such order granting suppression of identification will terminate or substantially handicap its prosecution of this case. Therefore, this appeal is properly before us for review.

Although the Commonwealth has filed its appeal from the October 27, 2009 order, it also contends that the court erred in suppressing the photographic identifications in its May 20, 2009 order. (*See* statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), D# 4; Commonwealth's brief at 11–12.) Since the order suppressing the photographic identifications was issued on May 20, 2009, and the Commonwealth's notice of appeal was filed on November 25, 2009, the trial court contends the "appeal from that order" was patently untimely[6] and likens the Commonwealth's attempt to have the prior

---

5. While the trial court did not direct the Commonwealth to file a concise statement of errors complained of on appeal, such a statement was filed on November 25, 2009. The trial court has filed a responsive Pa.R.A.P. 1925(a) opinion.

6. Pennsylvania Rule of Appellate Procedure 903(a) states that, generally, the notice of appeal should be filed within 30 days after the entry of the order from which the appeal was taken. Pa.R.A.P. 903(a).

order reviewed in the present appeal as "bootstrapping." (Trial court opinion, 3/15/10 at 2.)

The Commonwealth counters by citing the merger rule,[7] and contends that it is entirely proper for this court to review the order of May 20, 2009 as it "merged" into the October 27, 2009 order for purposes of appellate review. The Commonwealth further contends that it should not have been placed in the position of having to "choose between filing an immediate interlocutory appeal of an adverse ruling and forever forfeiting the right to review." (Commonwealth's brief at 12, 24–28.)

■ While there is certainly an intellectual appeal and factual similarity between the operation of the merger rule and the present circumstances, technically the merger rule does not apply to the present case. As even the Commonwealth acknowledges, the merger rule states: "a notice of appeal filed from **the entry of judgment** will be viewed as drawing into question any prior non-final orders that produced the judgment." *K.H.*, 573 Pa. at 493, 826 A.2d at 870 (emphasis added). (Commonwealth's brief at 25.) Stated alternatively, the merger rule merges into a **final judgment** all prior non-final orders for purposes of appellate review.

However, here, there has been no final judgment entered. Rather, the Commonwealth has simply filed an interlocutory appeal as of right from a later issued order. Again, the Commonwealth is entitled to take an interlocutory appeal when it certifies in good faith that the order appealed from terminates or substantially handicaps the prosecution. Undoubtedly, as certified by the Commonwealth, the October 27, 2009 order has substantially handicapped the prosecution of Fulmore and Kingwood.

■ In this case, it is evident that the May 20, 2009 and October 27, 2009 orders are intrinsically related. The joint suppression motion filed was merely decided in a succession of orders—with the out-of-court identification decided in the early order and the in-court identification decided in a later order.[8] In fact, it is clear that the court granted suppression of the in-court identification based on its earlier order. (Order, 10/27/09 at 2–3.) *See also Commonwealth v. Johnson*, 542 Pa. 384, 396–97, 668 A.2d 97, 103 (1995) (a motion to suppress an in-court identification cannot even be entertained absent a showing that the pre-trial identification process was unduly suggestive). Certainly, it seems to make logical sense that any other adverse ruling that contributed to the order directly appealed from should be subject to review. Thus, in the instant case, because the outcomes of the suppression motions were interdependent, we find that the appeal from the order deciding the second part of the suppression motion is timely

---

7. The merger rule holds that in an appeal taken from a final judgment, any prior interlocutory orders are deemed to have merged into the final judgment. *K.H. v. J.R.*, 573 Pa. 481, 494, 826 A.2d 863, 871 (2003).

8. We note that the trial court and the parties involved referred to the July 15, 2009 hearing as the "second part" of the motion to suppress identification. (Notes of testimony, 7/15/09 at 5, 6.) Additionally, the testimony from the April 30, 2009 suppression hearing was incorporated at the July 15, 2009 hearing

as the court noted "normally we would have kind of done it all together in a couple day hearing." (*Id.* at 75.) Of course, the current dilemma could have been avoided had the court ruled on both aspects of the identification issue in a single order, and we are at a loss to understand why the two related issues were bifurcated. Nevertheless, we note that allowing the review of the May 20, 2009 order in the present appeal essentially treats the matter as if it had been disposed of in a single order.

for purposes of appealing both the out-of-court and in-court identifications suppressed by the trial court.[9]

Before we begin our review of the two suppression orders, we first recite our standard of review.

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Foglia*, 979 A.2d 357, 360 (Pa.Super.2009), *appeal denied*, 605 Pa. 694, 990 A.2d 727 (2010) (internal citations and quotes omitted).

 "Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances." *Commonwealth v. Carson*, 559 Pa. 460, 480, 741 A.2d 686, 697 (1999), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000), *abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003). "Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but 'suggestiveness alone does not warrant exclusion.'" *Commonwealth v. Kubis*, 978 A.2d 391, 396 (Pa.Super.2009). Identification evidence will not be suppressed "unless the facts demonstrate that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Commonwealth v. Burton*, 770 A.2d 771, 782 (Pa.Super.2001), *appeal denied*, 582 Pa. 669, 868 A.2d 1197 (2005), *overruled on other grounds by Commonwealth v. Mouzon*, 571 Pa. 419, 429, 812 A.2d 617, 623 (2002), quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics. *Commonwealth v. Fisher*, 564 Pa. 505, 520, 769 A.2d 1116, 1126–1127 (2001).

In finding that the photo identifications were the result of an unduly suggestive identification process, the court seemingly places great emphasis on Detective Harrigan's variance from the descriptions initially provided by Hernandez. (*See* trial court opinion, 3/15/10 at 6–7.) We fail to see how that factor would cause us to conclude that the procedure was unnecessarily suggestive. *See In re Love*, 435 Pa.Super. 555, 646 A.2d 1233, 1237 (1994), *appeal denied*, 540 Pa. 579, 655 A.2d 511 (1995), *cert. denied*, 515 U.S. 1126, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995) ("there is no merit to

---

**9.** Moreover, the above stance operates to preserve the integrity of the current system. Here, while the suppression of the photo array was certainly a blow to the Commonwealth's case, pending the determination of the suppression motion as to the in-court identification, the May 20, 2009 order may not have been legitimately viewed as a "substantial handicap" to the Commonwealth's case. If the Commonwealth had prevailed as to the in-court identification, the Commonwealth would have had its crucial identification evidence.

the argument the identification process was unduly suggestive because the photos did not match the victim's description of her assailant.").

■ The variances are explained by the fact that Detective Harrigan suspected that Kingwood and Fulmore were the perpetrators and that Kingwood's appearance on the date of his arrest differed to some degree from Hernandez's description. In compiling an array that would meet due process standards, Detective Harrigan was required to place photos in the array of individuals who resembled the suspect, Kingwood, not the abstract created by Hernandez's post-incident description. We find that the trial court's reliance on such confuses the credibility of the identification with a claim of undue suggestiveness. *See Commonwealth v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120, 132 (1987), *appeal denied*, 518 Pa. 617, 541 A.2d 744 (1988) (finding that defendant claimed initial identification by victim did not match photo of defendant selected by victim is an issue dealing with credibility, not undue suggestiveness). *See also State v. Banks*, 59 Conn.App. 112, 755 A.2d 951, 956 (2000) (Fact that the array contained only photographs of men with facial hair, a characteristic that did not conform to the witnesses' description, did not make the array unnecessarily suggestive. Defendant points to no case law to support his argument that the photographs in the array must exactly meet the physical description of the suspect, especially where the most prevalent physical difference between the individuals in the photographs and the witnesses' descriptions was the presence of facial hair, which can change rapidly.).

Indeed, had Detective Harrigan chosen the remaining seven photos so as to closely track the description provided by Hernandez, Kingwood's photo would have stood out starkly, which is precisely what the law relating to photo arrays is structured to prevent. *See Commonwealth v. Thomas*, 394 Pa.Super. 316, 575 A.2d 921, 923 (1990) (no undue suggestiveness where all the individuals in array have reasonably similar features). Thus, we do not quite understand the court's hesitation in this regard.[10] Certainly the suppression court cannot be contending that it is impermissible for the police to show a crime victim a photo array that varies to some degree from the first description provided by the victim, and to the extent the suppression court suggests as much, we cannot agree. Effective law enforcement cannot be maintained within such narrow parameters.[11]

■ We now turn to the suppression court's concern relating to Detective Harrigan's usage of the phrase "which one comes to mind." (Order, 4/20/09 at 4, ¶ 25.) Detective Harrigan's instruction to Hernandez to close his eyes, think back on the incident, and tell him which one of the individuals depicted comes to mind may have implied that the assailant was included within the array. However, as there was no evidence that Detective Harrigan directed Hernandez's attention to a specific picture, the phrase may have been construed as merely a "catch phrase" of no

10. We are aware that the trial court requested to supplement its opinion; however, our disposition is based on the notes of testimony and the photo arrays included in the certified record.

11. Our discussion has related mostly to the array containing appellee Kingwood's photograph as the trial court concentrated primarily on this array. As the trial court noted, originally Hernandez was incapable of providing any significant detail in the description of the second assailant. Thus, the suppression court's concerns about Hernandez being shown an array that deviated from the description would be inapplicable as to Fulmore's array.

special significance. Moreover, providing such information to the witness before he views the lineup does not render the identification procedure unduly suggestive. After all, why else would a victim be shown a photo array unless the police believed the suspect's photo was included.

For instance, in *Kubis, supra,* the detective told the witness the suspect's picture was in the array. After the witness picked out two photos, the witness was told one of the people he selected was the suspect. A panel of our court found that procedure did not produce a substantial likelihood of misidentification. *Kubis,* 978 A.2d at 397. In *Love, supra,* we upheld an identification where "the detective told the victim there was a suspect in custody" during the identification procedure. *Love,* 646 A.2d at 1236. Thus, we do not find that Detective Harrigan's statements created a substantial likelihood for misidentification. We conclude that the witnesses' belief that one of the pictures included in the photographic array was the perpetrator did not render the pre-trial identification unnecessarily suggestive.

The trial court also emphasizes that the identification took place in a hospital and that the victim was on pain medication. (Order, 5/20/09 at 5.) Again, such a factor is irrelevant to the question of whether the photo array was unduly suggestive. Rather, we find that the victim's hospitalization or medication goes to credibility of the witness and the weight to be accorded his testimony not the suggestiveness of the procedure. *Kyle,* 533 A.2d at 132. *See also Commonwealth v. Sample,* 321 Pa.Super. 457, 468 A.2d 799, 802 (1983) ("There is no reason to assume that a hospital environment is inherently conducive to misidentification."). We do not find that the identification circumstances were suggestive.

■ Finally, we agree with the Commonwealth that there is no support in the record for the court's suggestion that although Detective Harrigan's behavior was not "consciously sinister," he must have said or done something "even at a subconscious level," to suggest to Hernandez who the perpetrators were. (Order, 5/20/09 at 5, ¶¶ 29–30.) *See Commonwealth v. Thomas,* 363 Pa.Super. 348, 526 A.2d 380, 381 (1987), *appeal denied,* 517 Pa. 616, 538 A.2d 498 (1987) (rejecting as "unthinkable" argument that photo identification procedure could be deemed impermissibly suggestive "because the detective unknowingly and unconsciously but perceptively, cued the victim.").

Viewed in its totality, we do not believe the circumstances created an identification process that was unduly suggestive. Hernandez was shown an eight photograph array wherein all the individuals depicted were substantially similar in features. We cannot accept the suppression court's assessment that appellee Kingwood's photograph somehow stood out from the others so as to increase the likelihood that his photograph would be chosen. As the photo array is not remarkable in any way, we find the trial court's determination to be in error. Moreover, even if Detective Harrigan's usage of the phrase "which one comes to mind" may have conveyed the idea that a suspect was included in the array and created extra pressure on Hernandez to identify one of the men depicted, the fact that none of the photographs stood out from the others yet Hernandez identified the individuals suspected suggests that Hernandez indeed recognized appellees from his own memory and not from an unduly suggestive array. Thus, we conclude that the suppression court erred in suppressing the photographic identifications.

Finding nothing in the record indicates any of the pretrial proceedings were tainted, we need not reach the second question of whether the in-court identification is inadmissible based on the suggestiveness of the out-of-court identifications and lacking an independent basis. *Commonwealth v. Hughes*, 521 Pa. 423, 441 n. 7, 555 A.2d 1264, 1272–1272 n. 7 (1989) (having concluded that police conduct did not taint witness' out-of-court identification, argument that witness lacked an independent basis for in-court identification need not be addressed); *Johnson, supra* (same). The suppression court's concern that the testimony of the victim during the preliminary hearing does not have an independent basis due to the victim's apparent certainty of identification goes to credibility, not the suggestiveness of the out-of-court identification.

Order suppressing the in-court identification reversed; order granting the suppressing of the photographic identifications reversed. Commonwealth's motion to correct omissions from the record is denied as moot. Jurisdiction relinquished.