J-S65018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANGELA L. DUPONT | : | |
| | : | |
| Appellant | : | No. 721 MDA 2019 |

Appeal from the Judgment of Sentence Entered, April 2, 2019,
in the Court of Common Pleas of Lancaster County,
Criminal Division at No(s):  CP-36-CR-0002201-2018.

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:  **FILED: MAY 11, 2020**

Angela L. Dupont appeals from a judgment of sentence of one year of probation, after a jury convicted her of fleeing the scene of a car accident.[1] She claims the trial court erred by not suppressing a witness's identifications of her from a photo array, which Dupont believes was so highly suggestive that it violated her due process rights.  We affirm.

Dupont filed a pretrial motion to prohibit Beauabe Kibret from testifying that she was the person who ran a red light, crashed her car into his, and fled the scene.  The court of common pleas conducted a hearing on that motion and related its findings of facts as follows:

> On November 8, 2017, at approximately 4:30 p.m., Beauabe Kibret was driving home from work when the front

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 3743(a).  The Commonwealth also charged Dupont with two summary offenses.

driver's side of his vehicle was struck by the front passenger side of another vehicle, a blue Saturn Vue. Mr. Kibret exited his vehicle and walked towards the vehicle that struck him.

Mr. Kibret . . . observed the other driver, including both the profile and the front of their face, from a distance of between two to three feet for 15 to 30 seconds. . . . [T]he driver of the other vehicle made direct eye contact with him. Before Mr. Kibret could make verbal contact with the driver of the other vehicle, she backed the vehicle up and drove away. Mr. Kibret testified the driver of the other vehicle was a Caucasian, thin female in her late twenties or mid-thirties who, at the time of the accident, had straight, "blondish" or blonde hair and was wearing a black shirt. [He] gave that description to Officer Brennan Stamm when [the police] arrived at the scene of the accident.

Approximately two months [later], Officer Stamm arrived at the scene of a traffic stop involving a blue Saturn Vue with frontend damage consistent with the November 8, 2017 accident. Officer Stamm testified that the driver and registered owner of the vehicle, [*i.e.*, Dupont], was similar to the description provided by Mr. Kibret.

Using a program called C-Penn on J-NET, Officer Stamm created a black-and-white-photo lineup that included a photograph of [Dupont], as well as the photographs of seven other Caucasian females between the age of 20 and 30, similar in appearance to [Dupont's] photograph. Officer Stamm . . . print[ed] the selected photographs as a group on a single sheet of paper [and] as individual eight by ten photographs. The women in the selected photographs all appear to have darker hair similar to [Dupont's] photograph, and . . . none of the women in the photo lineup appear to have blonde hair. Six of the eight photographs in the lineup, including the photograph of [Dupont], depict women with curly hair.

Officer Stamm contacted Mr. Kibret by telephone on January 19, 2018 and asked him if he would look at some photographs and attempt to identify the driver who hit him. [The officer] went to Mr. Kibret's place of employment and met with him in an office. Mr. Kibret first looked through the individual photos and testified that he was able to narrow it down to three of those photographs. [He flipped]

through the individual photos for a couple seconds and appeared to be having difficulty with not having the photos lined up side-by-side. [So] Officer Stamm then placed the group of photographs on the single sheet in front of Mr. Kibret and told him to take his time. . . . after looking at the group of photographs on the single sheet for second or so, [Mr. Kibret] was able to identify [Dupont's] photograph as the driver of the vehicle that hit him and subsequently signed and dated near her photograph.

Mr. Kibret appeared to have some difficulty either recalling or relaying the details of the January 19, 2018 lineup. He testified that two of the three photographs he initially selected from the individual photographs depicted women with blonde hair. However, Officer Stamm testified credibly that the individual photographs matched the photographs on the single sheet and that there were only eight. None of the women in those photographs appeared to have blonde hair. Mr. Kibret also testified inconsistently about whether he could recall [Dupont's] photograph being one of the original three he selected. . . . [H]e stated clearly that [Dupont's] photograph was one of the three he initially picked. But when questioned about whether those three initial photographs were also on the single sheet of photographs and whether the photograph he ultimately selected was among the initial three, Mr. Kibret stated that he could not recall.

Mr. Kibret . . . was confident in his identification despite [Dupont's] dark, curly hair in the photograph, because it was her facial features that he recognized. After Mr. Kibret selected [Dupont's] photograph, he noted to Officer Stamm that her hair was a different color, and Officer Stamm stated in reply that women often change their hair color. . . . The background of [Dupont's] photograph is slightly lighter than the other photographs, the width of [her] photograph is slightly narrower than the other photographs, and [she] appears to be the only person photographed with an eyebrow piercing, although one of the other photographs depicts a woman with noticeable ear piercings.

Trial Court Opinion, 2/1/19, at 1-5 (footnotes omitted).

Based upon those facts, the suppression court concluded that the photo array was not unduly suggestive. Furthermore, even if the array was unduly suggestive, the court determined that other indicia of reliability in Mr. Kibret's identification outweighed any suggestiveness from the photo array. Thus, the suppression court denied Dupont's motion to prevent Mr. Kibret from testifying that Dupont had hit him.

As mentioned, a jury convicted Dupont of fleeing the scene of a vehicle accident, because it credited Mr. Kibret's recollection of the incident and rejected Dupont's alibi. Next, the trial court convicted her of related summary offenses and sentenced her to one year of probation and to pay Mr. Kibret $2,232.60 in restitution damages, a $200 fine, and other court fees and costs. This timely appeal followed.

Dupont raises one issue. "Did the trial court err [by refusing] to suppress Mr. Kibret's identification of her from a suggestive, photographic lineup, where said identification was unreliable and tainted by the officer's interference in the identification . . . ?" Dupont's Brief at 4.

Under Dupont's theory, the photo array was unduly suggestive, and, as a result, the trial court violated her state and federal, procedural due process rights by allowing Mr. Kibret to testify against her at trial. However, she does not claim that the Constitution of the Commonwealth of Pennsylvania affords any greater protection in this regard than the federal charter. Thus, we review her state and federal claims together and analyze the respective safeguards of the two constitutions as coextensive.

Our standard of review on whether a police officer conducted an unduly suggestive photo array is *de novo*. ***See, e.g., Commonwealth v. Kearney***, 92 A.3d 51, 65 (Pa. Super. 2014); ***United States v. Burnett***, 773 F.3d 122, 130 (3rd Cir. 2014). Here, because the Commonwealth prevailed below, our scope of review includes "only the evidence of the prosecution and whatever evidence for the defense . . . remains contradicted on the context of the whole record." ***Commonwealth v. Williams***, 756 A.2d 957, 959-60 (Pa. Super. 2000).

Under the federal Due Process Clause, defendants seeking to exclude eyewitness-identification testimony must satisfy a two-step test. "The defendant has the initial burden of demonstrating the [photo array] procedure was impermissibly suggestive." ***Reese v. Fulcomer***, 946 F.2d 247, 259 (3rd Cir. 1991). "Only if the defendant meets this initial step will the court consider the admissibility of the identification under the totality of the circumstances." ***Id.*** (quoting ***United States v. L'Allier***, 838 F.2d 234, 239 (7th Cir. 1988)) (some punctuation omitted). Because Dupont's claim fails the first test, we need not consider the second.

Dupont contends that Officer Stamm created and showed a photo array that violated the pronouncements of the Supreme Court of New Jersey in ***State v. Henderson***, 27 A.3d 872 (N.J. 2011). Thus, although she does not directly say so, Dupont would have us apply New Jersey constitutional law to overturn the legal conclusions of a Pennsylvania suppression court. She even acknowledges that ***Henderson*** conflicts with the precedents of this Court,

expressly condoning the procedure Officer Stamm followed in compiling and displaying the photo array.

For example, she states, "**Commonwealth v. Fulmore**, [25 A.3d 340, 346-347 (Pa. Super. 2011),] held that a photographic lineup that does not match the description provided by the eyewitness is a matter of credibility, not undue suggestiveness." Dupont's Brief at 24. "The **Fulmore** Court also held that it was not unduly suggestive to inform the witness that a photo array contains a picture of someone [the investigator] believed to have committed the offense. **Fulmore** at 347-348; **see also Commonwealth v. Kubis**, 978 A.2d 391 (Pa. Super. 2009) (same)." **Id.**

In **Fulmore**, this Court reasoned that an officer stating to a witness that he believes that the image of the suspect is in a photo array does not render the photo array unduly suggestive, because that belief is inferentially implied anytime an officer assembles and displays a photo array. "[W]hy else would a victim be shown a photo array unless the police believed the suspect's photo was included?" **Fulmore**, 25 A.3d at 348. Hence, an officer saying that the suspect's photo is, in his opinion, included in the array simply gives voice to the obvious. If that obvious statement is unduly suggestive, then any photo or in-person lineup is, *per se*, unduly suggestive, because an officer's use of a photo or in-person lineup implies that he thinks the suspect is included.

Dupont's view of what constitutes an unduly suggestive photo array therefore directly conflicts with the precedent of this Court. Indeed, she challenges our case law as being "at odds with what we now know about the

science of eyewitness identification, and with appropriate eyewitness identification protocol." Dupont's Brief at 25 (citing **Henderson**, **supra**.) While it is unclear who she means by "we" or to what "science" Dupont refers, her reliance upon **Henderson** fails before this panel.

"It is beyond the power of a Superior Court panel to overrule a prior decision of the Superior Court, except in circumstances where intervening authority by **our** Supreme Court calls into question a previous decision of this Court." **Commonwealth v. Pepe**, 897 A.2d 463, 465 (Pa. Super. 2006) (emphasis added). The **Henderson** Court is not "our" Supreme Court, and we therefore may not follow its precedent in violation of our own. Accordingly, the New Jersey court has no power to displace the settled jurisprudence of this Commonwealth. While Dupont's claim that Officer Stamm's photo array was unduly suggestive under **Henderson** might persuade this Court to reconsider its precedents *en banc*, three judges may not apply **Henderson** in the face of contrary, binding precedent.

Additionally, in **Henderson**, the Supreme Court of New Jersey used its supervisor power over that state's court system to appoint a special master who conducted an extensive **Frye** hearing.[2] The master heard the testimony of various experts from across the nation to determine whether those courts' acceptance of eyewitness identifications rested upon junk science. After

---

[2] **See Frye v. United States**, 293 F. 1013, 1014 (D.C. Cir. 1923) (holding that, to be admissible in a court, scientific, expert evidence requires "general acceptance in the particular field in which it belongs."), *abrogated federally*, **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579 (1993).

reviewing the master's prolific record, the **Henderson** Court concluded that "[s]tudy after study revealed a troubling lack of reliability in eyewitness identification . . . the record proves that the possibility of mistaken identification is real." **Henderson**, 27 A.3d at 877-78.

Unlike in **Henderson**, no **Frye** hearing took place in this case; thus, no comparable record of studies and experts is before us for appellate review. Nor did Dupont ask the suppression court to hold a **Frye** hearing on the science, so she could create an evidentiary record for our review. Any "claims not raised in the trial court may not be raised for the first time on appeal." **Commonwealth v. Johnson**, 33 A.3d 122, 126 (Pa. Super. 2011); **see also** Pa.R.A.P. 302(a) (accord). To the extent Dupont attacks our acceptance of eyewitness identification as being scientifically unsustainable, she has waived that argument by failing to create a factual record to prove her premise and by failing to request a **Frye** hearing on the question.

Lacking the insights and data that a **Frye** hearing could have provided, the suppression court concluded the photo array at bar was not unduly suggestive under existent, Pennsylvania law. That court opined as follows:

> Suppression is only warranted . . . where the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. **Commonwealth v. Kendricks**, 30 A.3d 499, 504 (Pa. Super. 2011). Allegations of incidental variations in appearance do not prove undue suggestiveness. **Kearney**, 92 A.3d at 66. Photographs in a lineup are not unduly suggestive if the suspect's picture does not stand out more than the others and the people depicted all exhibit similar facial characteristics.

*Commonwealth v. Fisher*, 769 A.2d 1116, 1126-1127 (Pa. 2001).

> In the instant case . . . the photographic lineup was not unduly suggestive. . . . The women depicted in the photographs all exhibit very similar facial features and hair styles and [Dupont's] photograph does not stand out among the others, despite her being the only one pictured with an eyebrow piercing. In fact . . . the large, dark ear piercings of a different women stand out more than the barely visible piercing on [Dupont's] eyebrow. Furthermore, although it does appear as though the background of [Dupont's] photograph is slightly lighter than the other photographs, the backgrounds remain similar, and the [suppression court] does not find that the slight variation causes it to stand out to a substantial degree. The most significant difference in the photographs is the slightly narrower width of [Dupont's] photograph, which causes a slightly wider gap between [Dupont's] photograph and the next photograph. While the gap is noticeable . . . it [is not] significant or unduly suggestive. Most importantly . . . there is no indication that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Trial Court Opinion, 2/1/19, at 6-8.

Our review of the photo array confirms these findings. The thorough, well-reasoned analysis by the learned Judge Howard F. Knisely dispenses with any claim that the photo array was unduly suggestive. We therefore adopt his analysis as our own and conclude that the suppression court's decision to deny Dupont's pretrial motion was constitutionally sound.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/11/2020