J-A03019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| FREDERICK R. CAMEJO | : | No. 818 WDA 2023 |

Appeal from the Order Entered June 15, 2023
In the Court of Common Pleas of McKean County Criminal Division at
No(s):  CP-42-CR-0000412-2022

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED: MARCH 18, 2024**

The Commonwealth appeals from the order granting Frederick Camejo's motion to suppress evidence.  We reverse and remand.[1]

On May 29, 2022, Bradford City Police Officer Joshua Frederoski obtained a warrant to search Camejo's house, located at 166 Congress Street in Bradford.  The attached affidavit provided that Camejo told police that he shot the deceased, known as "Bo," outside his house.  It also stated:

> all of the above incident could be located and observed from [Camejo's] in home surveillance system located at 166 Congress St. . . . . CAMEJO stated he was the individual who shot "Bo" with a gun and that the whole thing would be found on his surveillance cameras inside the 166 Congress St. residence.

Search Warrant, 5/29/22, at 3–4.

---

[1] The Commonwealth separately appealed from an earlier suppression order, docketed in this Court at 561 WDA 2023.  Contemporaneously with this decision, we quash the appeal from the earlier order.

The warrant authorized police to search for and seize, among other items:

> electronic devices (home surveillance cameras/footage, modem/ router storage device (s) cellphone(s) and or associated with the phone numbers of 814-558-1396 and 814-596-6995 and or audio/video recordings at the residence that could have captured evidence of the crime associated with this incident.

Search Warrant, 5/29/22, at 6 (verbatim).

Later that morning, Chief McKean County Detective Ryan Yingling joined Bradford City Police Sergeant Jason Daugherty to execute the warrant. Camejo's wife Antrika Camejo led the officers upstairs, where she plugged in an electronic device and showed them the footage of the shooting. Police seized, among other items, Camejo's cell phone (which had a different number than those listed in the warrant). The suppression court made extensive factual findings about the execution of the warrant, largely corroborated by video from Sergeant Daugherty's body camera:

> Detective Yingling initially met with Bradford City Police officers, including Sgt. Jason Daugherty, on the street in front of the home where the shooting had taken place. He testified that he was "briefed." He was apprised that a search warrant had been obtained to search the residence. He did not read the warrant but "Daugherty talked about the surveillance system." He was aware that there was a security system at the home that captured video footage of the shooting. Further, he had "discussed (with Daugherty) what we were looking for, looking for cellphone."[2]

_____

[2] The suppression court relied on its own notes from the hearing held May 2, 2023. In the certified notes of testimony, it does not appear that Detective Yingling said that he had not read the warrant or that Sergeant Daugherty told him that they were looking for a cell phone. **See** N.T., 5/2/23, at 7 (explaining Detective Yingling's focus on cameras and ammunition).

After the discussion with Sgt. Daughtery and other officers in front of the home, Detective Yingling and Sgt. Daugherty walked to a back door of the home. Detective Yingling knew that Sgt. Daugherty had the warrant and was going to the home to execute it. Sergeant Daugherty's body camera was running and captured video and audio of what occurred. The Commonwealth played a portion of the video that showed: Detective Yingling being at the scene, in front of [Camejo's] residence; Detective Yingling and Sergeant Daugherty walking to the back door of the home and knocking on a door; [Camejo's] wife opening the door and allowing them to enter; what occurred after they entered; and, a portion of what occurred after they exited the home.

After they knocked on the back door of the residence[, Camejo's] wife, Antrika Camejo, opened the door. Sergeant Daugherty asked Mrs. Camejo if they could enter and she indicated that they could. Sergeant Daugherty indicated, with Detective Yingling standing right beside him, that "we have a search warrant" and that "we are looking for anything that has to do with what happened." Detective Yingling indicated that the officers had been advised "it was self-defense." The conversation between the officers and Mrs. Camejo was cordial and non-threatening. At one[ ]point Mrs. Camejo indicated that someone had been yelling to her, after the shooting, not to talk to the police. She explained that she was willing to talk to the police. The officers did not threaten her or push her to provide information. Often Mrs. Camejo provided information to the officers without any questions from them. It was clear from the video evidence presented that Mrs. Camejo wanted to, and willingly did, provide information to the officers.

Mrs. Camejo explained that the victim and additional individuals had come to her home and that she was "making chicken." As the group was conversing the victim, who she referred to as "that guy," told her "you are a Ho." Her husband told her after the shooting that "that guy flashed a gun." Mrs. Camejo explained that "that guy" would not leave and her husband told her "go get a gun[," and] she responded "no, we aren't getting into that." The individuals that were with the victim then "had him go." Her husband then went upstairs, and she stayed downstairs. She then "heard 3 shots" and she "grabbed my gun and called 911."

During this conversation Detective Yingling asked Mrs. Camejo about the camera system for the home. He asked about

- 3 -

the camera system shortly after Sergeant Daugherty indicated that they had a search warrant; and, he asked about it immediately after Mrs. Camejo indicated that she had heard the 3 shots, stating: "when was the last time the cameras were on?" Mrs. Camejo responded: "I don't know if the cameras were still recording." Sergeant Daugherty then asked if they could view the footage of the incident. Mrs. Camejo then, without hesitation and in a manner that conveyed that she wanted the officers to see the footage, took the officers to the second floor to a room and area by a fish tank. She explained that there had been [a different, unrelated] incident the prior day . . . and her husband had tried to reset the electronic device attached to the cameras, which was referred to as "the box," the day prior when he had attempted to view video footage from it. She stated that "he unplugged it yesterday." She picked up "the box" which had several intertwined cables coming out and around it. She attempted to plug cables into it and into a tv screen above "the box." She stated: "it records to this ("the box") and you can access this from this and my cellphone." For several minutes Mrs. Camejo, while talking to the officers, attempted to untangle and plug cords into "the box" and the tv screen. Detective Yingling then assisted her in plugging in cords, and, stated something regarding "the power cord." [The security system logo then appeared on the screen, and Mrs. Camejo stated what she thought the password was.] She then attempted, several times, to enter a password to open the camera system. In response to questions from the officers, she indicated: "yeah, he had to login on my phone."

After several attempts, Mrs. Camejo entered the correct password[,] and images from different cameras appeared on the tv screen. At the time that she was opening the images to view captured footage of the incident, including what had occurred prior to and during the shooting, Mrs. Camejo had a cellphone in her hand, which rang several times. She then played footage and stated: "this is when the incident first happened." On the tv screen footage of individuals leaving the front door of the residence can be seen. While this image was being played, Detective Yingling stated to Mrs. Camejo: "you understand that you are not under arrest and you are not in custody." Mrs. Camejo then explained that someone had started yelling to her when the police first arrived: "not to talk to them and to get a lawyer." She explained that: "I do not feel my husband is in the wrong." It was clear from this exchange that Mrs. Camejo was willingly talking to Detective Yingling and Sergeant Daugherty and she was willingly

showing them the captured video footage and how to gain access to it.

    Immediately after she told the officers that "I do not feel my husband was in the wrong," and while the footage was on the tv screen, she explained that: "no one else has access (to the cameras and captured footage). Just me and my husband." Detective Yingling then indic[a]ted to her: "just the box, his phone and your phone." Footage of when the cellphones were actually taken was not played at the hearing.

    The Commonwealth also played a brief portion of the footage from Sergeant Daugherty's body cam that depicted what occurred after Sergeant Daugherty and Detective Yingling left [Camejo's] residence. Detective Yingling is holding a cellphone and is explaining to Bradford City police officers to "keep them powered up" and to "place them on airplane mode." At one point you can see that Sergeant Daugherty is holding either the search warrant for the home or the Inventory List for the search.

    In his testimony Detective Yingling explained that, when speaking with Mrs. Camejo, he wanted to find out how to gain access to the video footage and to assure that the footage could be preserved and not deleted or altered by any of the parties. Therefore, he had asked her who had access to the footage and how it could be viewed. When she explained that access could be obtained using "the box," [Camejo's] phone and her phone, he believed it was critical to obtain all 3 of them so that the footage could not be deleted or altered. He asserted that "she (Mrs. Camejo) voluntarily gave me the phones" after he had told her that they needed to preserve the footage.

Opinion, 6/15/23, at 2–6 (footnote omitted).

    Officer Frederoski later obtained a second warrant, authorizing police to search the contents of both cell phones.

    On June 14, 2022, Camejo was charged with homicide and related crimes. He moved to suppress the seizure of his cell phone because the affidavit in the first warrant did not provide probable cause that evidence of a crime would be found on the phone. The suppression court held a hearing on

March 29, 2023. The court limited the Commonwealth to presenting evidence within the four corners of the first search warrant. On April 4, 2023, the suppression court entered an opinion, concluding that the warrant did not authorize police to seize the phone:

> There is no mention in the Affidavit of a cellphone being used by [Camejo], to communicate with the victim or otherwise. The only mention of it is where the [affiant] sets forth the items that they intend to search for and seize. . . .
>
> The mere assertion that cellphones commonly contain evidence of crimes is not enough without other specific information demonstrating that there is likely evidence of a crime on the [specific phone sought]. . . .
>
> [T]here is nothing in the warrant that indicates that the video surveillance images were captured on, or accessible from, [Camejo's] cellphone. The Commonwealth asserts that it is common knowledge. However, that common knowledge should still have been placed in the Affidavit. We are limited when reviewing whether probable cause exists for the grant of a warrant to what is specifically set forth in the Affidavit of Probable Cause.

Opinion, 4/4/23, at 9.

The Commonwealth moved to reconsider and reopen the record, giving notice that it intended to present evidence of alternative justifications for the seizure. The suppression court denied reconsideration but granted the Commonwealth's request for a further hearing, scheduled for May 2, 2023. At the hearing, the Commonwealth presented the testimony of Detective Yingling and entered the body camera footage from Sergeant Daugherty into evidence.

On June 15, 2023, the suppression court granted Camejo's motion to suppress. It ruled that neither of the Commonwealth's alternative theories justified the seizure of the cell phone: there were no exigent circumstances,

and Detective Yingling was not an "independent source" from the Bradford City officers. Opinion, 6/15/23, at 13–18.

The Commonwealth timely appealed, certifying that the June 15, 2023, order "terminates or substantially handicaps the prosecution." The Commonwealth and the suppression court complied with Pennsylvania Rule of Appellate Procedure 1925.

We turn to the merits of the suppression court's opinion and order granting Camejo's motion.[3] The scope of our review in this appeal is limited to any evidence from the defendant's witnesses and any prosecution evidence that remains uncontradicted. *Commonwealth v. Mercado*, 205 A.3d 368, 371 (Pa. Super. 2019) (citation omitted). We are bound by the suppression court's factual findings if they are supported by the record. *Id.* However, our review of the suppression court's legal conclusions is *de novo*. *Id.*

We begin with the ruling that the affidavit attached to the first warrant did not provide probable cause to seize Camejo's cell phone.[4] Probable cause is "a practical, common-sense decision whether, given all the circumstances

---

[3] The Commonwealth also challenges the suppression court's decision to bifurcate the hearing and to require the Commonwealth to raise its alternative justifications for seizure in a separate filing. Because the Commonwealth has not requested relief from these procedural issues, we decline to provide an advisory opinion on them. *See Commonwealth v. T.J.W.*, 114 A.3d 1098, 1102 (Pa. Super. 2015) (declining to address an issue "if in ruling on it the Court cannot enter an order that has any legal force or effect").

[4] We may review this ruling because it contributed to the order from which the Commonwealth now appeals. *Commonwealth v. Fulmore*, 25 A.3d 340, 345 (Pa. Super. 2011).

set forth in the affidavit[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place." ***Commonwealth v. Green***, 265 A.3d 541, 551 (Pa. 2021) (citation omitted). A reviewing court determines whether there was a "substantial basis" for the issuing authority to conclude that probable cause existed. ***Commonwealth v. Batista***, 219 A.3d 1199, 1202 (Pa. Super. 2019) (quoting ***Illinois v. Gates***, 462 U.S. 213, 238–39 (1983)). In doing so, the court limits its review to "the information within the four corners of the affidavit." ***Id.***; ***see*** Pa.R.Crim.P. 203(D).

A warrant can only authorize the police to seize items for which probable cause exists; otherwise, the warrant is unconstitutionally overbroad. ***Green***, 265 A.3d at 549–50. To assess overbreadth, a court must measure the warrant's description of the items to be seized against the items for which there is probable cause to search. ***Id.*** at 550. The Supreme Court of Pennsylvania has explained:

> Any unreasonable discrepancy between the items for which there was probable cause to search and the description in the warrant requires suppression. This is because an unreasonable discrepancy reveals that the description was not as specific as reasonably possible, meaning the warrant is overbroad, ambiguous, or perhaps both.
>
> At the same time, we have also recognized the fact-dependent nature of such claims, and cautioned that search warrants should be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice. In that vein, we have held that where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe the general class of the item he is seeking.

*Id.* at 550 (quotation marks, brackets, and citations omitted).

*Green* provides an example of a warrant that withstood an overbreadth challenge. There, the affidavit established probable cause to believe that a computer user at a suspect's home was sharing child pornography on a certain network, and the warrant authorized police to seize every digital device in the home that could access the Internet. *Id.* at 551–52. Testimony from the suppression hearing established that prior to the search, police could not determine which device in the home had been used to share the pornography. *Id.* at 552. The expansive scope of the items authorized to be seized did not render the warrant overbroad: "Based on the information available to the corporals at the time they requested the warrant, the pornography could have been shared by any user on any device using the internet in the home. There was no way to narrow this inquiry without conducting a search." *Id.*

Here, the affidavit attached to the first search warrant established probable cause to believe that evidence of the shooting would be found on the surveillance system. Camejo said as much. Search Warrant, 5/29/22, at 3–4. We thus assess whether there is an "unreasonable discrepancy" between the items for which there was probable cause—the surveillance system—and the description of what the police could seize. *Green*, 265 A.3d at 550.

Notably, the suppression court's factual findings illustrate that when police executed the search warrant, they still had to determine what components made up the surveillance system. *See* Opinion, 6/15/23, at 4–6. Detective Yingling explained that in speaking with Mrs. Camejo, he learned

that there were "three ways to access the system"—the box in the room and the two phones, which he seized. N.T., 5/2/23, at 17–18.

We find no unreasonable discrepancy. As in **Green**, the police could not know before the search which electronic devices would contain evidence of a crime. Therefore, under the circumstances, the first search warrant described the object of the search as precisely as possible. While executing the warrant, Detective Yingling and Sergeant Daugherty questioned Mrs. Camejo to find out what devices could access the surveillance system. These are the devices that the warrant, through Camejo's statements, established probable cause to seize.[5]

This reasoning agrees with the suppression court's observation that "nothing in the warrant . . . indicates that the video surveillance images were captured on, or accessible from," Camejo's phone. Opinion, 4/4/23, at 9. It is precisely because the police did not know how the surveillance system was configured that Officer Frederoski would not have included this assertion. And because the police did not know beforehand which electronic devices could access the surveillance footage, the description was as precise as possible.

In conclusion, the first search warrant provided probable cause to seize the surveillance system, and police seized Camejo's phone because it was part of that system. Because the warrant justified the seizure of the phone, we

---

[5] The seized phone having a different number than the two numbers listed on the warrant shows that the police took it because it was a component of the surveillance system, not because it was one of the phones that was also listed.

reverse the order granting suppression. We note that the suppression court ruled only on whether the seizure of Camejo's phone was justified; the court did not address whether the second warrant, to search the contents of the phone, was supported by probable cause. Opinion, 4/4/23, at 1; *see* Omnibus Pre-Trial Motion, 12/16/22, at 6–7. We express no opinion on this distinct issue.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 3/18/2024